215 So.2d 823

John V. UNVERZAGT

v.

YOUNG BUILDERS, INC.

No. 49096.

Nov. 12, 1968.

Rehearing Denied Dec. 16, 1968.

Bean & Rush, Warren D. Rush, Lafayette, for defendant-appellee-applicant.

Pugh, Buatt, Landry & Pugh, J. W. Landry, Jr., Crowley, for plaintiff-respondent.

HAMITER, Justice.

John V. Unverzagt, the plaintiff, seeks to recover in this cause the cost of removing and replacing an alleged defective swimming pool constructed for him by the defendant, Young Builders, Inc.

The district court dismissed the suit. But its judgment was reversed on appeal, the Court of Appeal having awarded damages to the plaintiff in the sum of $14,000. 207 So.2d 405.

In an application to this court the defendant urged numerous errors, among those

being that the Court of Appeal erred in finding that the damages resulted from faulty construction of the pool and also in failing to hold that plaintiff should have minimized them when he became aware of the condition.

We granted certiorari, but limited our consideration to the issue of quantum based on a determination of whether or not the plaintiff should have minimized his damages. 251 La. 1055, 208 So.2d 325

Consequently, the question as to the cause of the damages is no longer at issue. We must determine only whether the plaintiff should be limited in his recovery to an amount which allegedly would have corrected the fault at an early stage. Incidentally, the pool now is a total loss and must be removed and rebuilt.

Construction of the pool, located behind plaintiff's residence in Crowley, Louisiana, commenced in December, 1964. It was filled with water and delivered by defendant to plaintiff in March, 1965. Plaintiff was billed, and he made final payment for it in May, 1965. During such period there was also constructed on the rear of the property a brick fence, it passing along and near the deep end of the pool; some subsurface drainage; and a pebblestone patio. All of these were built by different contractors.

Before the pool was completed a crack developed in its floor which was repaired.

In July, 1965 another crack appeared in the bottom. The pool was drained later, and the crack was fixed in August, 1965.

Shortly thereafter cracks appeared in the coping around the top of the pool, mostly in the area of the skimmers on two sides thereof. Also it appeared to plaintiff then that the pool was losing water faster than it should, which belief he communicated to the defendant's representatives. He was told that it was the result of normal evaporation.

Finally, in September, 1965, plaintiff and his wife began seriously urging their dissatisfaction to the defendant's agents; and the former also employed the services of Mr. Harold Letz, a civil engineer who had designed (but had not constructed) the subsurface drainage, to determine the cause of the trouble.

Upon completion of his investigation Letz, on December 31, 1965, made a written report to plaintiff. In it he observed that there was visible evidence of an unstable condition in the pool and patio area, and that the pool was rising unevenly causing rapid deterioration of the concrete topping of the pool. The report further advised of the possibility that leakage from the pool itself might be the cause of the trouble. It strongly recommended that corrective measures be taken immediately, including *"extensive remedial work to stabalize the pool."*

A copy of such report was transmitted to the defendant; and on January 19, 1966 Mr. D. S. Young, its president, replied to plaintiff *denying any leakage from the pool* and suggesting that the problem resulted from surface drainage—from cracks in the patio and brick wall—for which his company was not responsible. And he proposed a meeting of all of the parties with their engineers and attorneys.

The meeting was held on January 31, 1966. Among those present were plaintiff, Mr. Young, Mr. Letz, Mr. Pat Cashman who had constructed the patio, and a Mr. Carlton Wood of Beaumont, Texas, who had ·been called in by the plaintiff as a swimming pool construction expert.

At this meeting Mr. Young *again denied that there were any defects in the pool.* But, Mr. Wood, who at that time had made one examination of the pool and premises, *expressed the belief that the fault was with the pool* in that there was leakage from the skimmers and over the top of the panels. He also thought that an overflow should be constructed, and agreed with Mr. Letz that the situation should be corrected as soon as possible *to avoid further damage.* He reiterated this belief, while testifying at the trial of this matter, saying that he felt "reasonably sure" that the problem could have been arrested by certain alterations suggested by him. He "estimated" that the cost of those repairs would run from $1000 to $1500. He further stated

that he had so informed the plaintiff on January 31, 1966.

It is solely on the basis of this testimony of Mr. Wood that the defendant now contends that the plaintiff should have then (in February, 1966) expended the sum of $1000 to $1500 to make the repairs suggested so as to mitigate the damages; and that, because he failed to do so, his damages should have been limited to this amount.

In fact, it was on the showing thus made by defendant in its application that we granted certiorari to consider the question, particularly since the plea in mitigation had not been specifically mentioned in the opinion of the Court of Appeal. However, our examination of the record in its entirety has revealed facts and circumstances not brought to our attention when we considered the application. Viewing them in connection with the applicable law, we have concluded that there is no merit in the defendant's complaint.

■ Although there are very few cases from this court in regard thereto, there is no doubt but that the doctrine of mitigation of damages applies in this state, as well as in the common law jurisdictions. (In some of the latter it is referred to as the doctrine of avoidable consequences.) However, there are numerous decisions of our Courts of Appeal which deal with the principle, some applying it and some denying its ap-

plicability, depending on the particular facts of each case. Likewise, Louisiana Revised Civil Code Article 2323 forms the basis for such doctrine.

Perhaps the best exposition of the principle, insofar as it is pertinent to the instant matter, appears in 22 American Jurisprudence, 2d, pages 53, 61 and 282, verbo "Damages" (Sections 32, 37 and 203). Therein it is stated: "Section 32. Under the doctrine of avoidable consequences, *the injured person need not make extraordinary efforts or do what is unreasonable* or impracticable in his efforts to minimize damages; reasonable diligence and ordinary care are all that is required to allow full recovery of all damages caused by the defendant's wrongful activity. More completely stated, the consequences of an injury are recoverable where the injured party acts with such care and diligence as a man of *ordinary prudence would under the circumstances, and his efforts to minimize damages are determined by the rules of common sense, good faith, and fair dealing.* What constitutes reasonable care depends upon the circumstances of the particular case, taking into consideration time, knowledge, opportunity, and expense. An injured person may recover to the full extent of his injury where he shows reasonable grounds for his failure to make an effort to lessen his damages. Thus, the repeated assurances of the defendant after an injury has begun that he will remedy the condition is sufficient justification for the plaintiff's failure to take steps to minimize loss, so long, at least, as there is ground for expecting that he will perform.

" * * *

"Section 37. Following a breach, it is *sometimes* possible for the nondefaulting party to minimize his damages by spending a sum of money. If the courts were to require this expenditure in *every* case in which it turns out, as a matter of *hindsight,* that such expenditure would have minimized the loss, courts would effectively be requiring the innocent party to incur risks beyond those in the contract *in the hope* that damages could be recovered from the breacher. Therefore, courts generally do not determine damages based upon the making of these expenditures unless (1) they are small in comparison to the possible losses, and (2) *it is virtually certain that the risks incurred will avoid at least a part of the loss.* Damages will not be decreased through showing that a *substantial expenditure* would have minimized the total loss or that the suggested expenditure may or may not have decreased damages. *The defaulter is in no position to cast this risk of substantial expenditures on the plaintiff. Since such risks arose because of the breach, they are to be borne by the defaulting party.*

*"Where the party whose duty it is to perform a contract has equal opportunity for performance and equal knowledge of the*

*consequences of nonperformance, he cannot, while the contract is subsisting and in force, be heard to say that the plaintiff might have performed for him.* Thus, where one who is bound to indemnify another points out to the latter how he may avoid the loss, the indemnitee is not bound to resort to such means if the indemnitor had an equal opportunity to avail himself thereof. * * *

" * * *

"Section 203. * * * Following breach, the nondefaulting party's damages will be measured as though he had acted *reasonably* in not enhancing the damages caused by the breach. To the extent that the nondefaulting party has not acted reasonably and has thereby failed to avoid certain consequences which are now claimed as damages, the party who is in default may show those consequences in reduction of damages. Therefore, if a *reasonably prudent person acting under the facts and circumstances in which the nondefaulting party found himself* would have minimized the claimed losses by entering into other contracts either with a third party or, in some jurisdictions, with the defaulting party, this fact may be shown in reduction of damages. * * * The party who is in default may not, however, mitigate his damages by showing that the other party *could have reduced those damages by expending large amounts of money or by incurring substantial obligations."* (Italics ours.)

The question here then is: would a reasonably prudent man have undertaken the work proposed by Wood under the circumstances as they appeared to him in January, 1966—not when viewed in hindsight and predicated on the evidence adduced at the trial? Based on the foregoing factual recitations and the following circumstances we think not.

In September, 1965, when plaintiff's wife visited Mr. Young at his office to express her concern over the condition of the pool, he told her to call the contractors who had installed the other improvements and to particularly ask what would be done with the patio's sinking; and he told her that "we would certainly do our part to correct whatever was within our obligations" and that he would get some engineers to make an inspection. He asserts that he did have such an inspection made within a few days but, other than to install some caulking, he did nothing further. Thereafter, in January, 1966, he received from plaintiff the report of Mr. Letz which contained the complaint that the pool was losing water. As a result thereof he, as heretofore shown, initiated the conference which was held January 31, 1966.

It is true that at this time Mr. Wood was "reasonably sure" that the problem could have been arrested for the estimated sum of $1000 to $1500, and that he told this to the plaintiff. On the other hand Mr.

Young himself, also a swimming pool construction expert and who had obtained other expert opinions, *was equally sure that Mr. Wood's surmise as to the cause of the condition was erroneous and he so informed plaintiff*. Then there was the opinion of Mr. Letz who was not sure where the trouble was. Moreover, his report of December 31, 1965 clearly showed that he considered that "extensive remedial work" would then be required to stabilize the pool. And he further observed in his written report: " * * * If the bottom of the pool has moved as has the top, then probably your best solution would be the complete reconstruction of the pool."

Again, in view of the diverse opinions of the experts, it was agreed by all the parties at the meeting of January 31, 1966 that further tests would be required to pin point the primary cause, the cost of which was to be borne by Cashman and the defendant. One of these, to be made at Young's request and under his supervision, was not made until April 28, 1966 (this test by Dr. Louis J. Capozzoli). The check on the sub-surface drainage, which was also suspect, was not made until after this suit was filed.

■ First of all, we are not so sure that $1000 to $1500 is a nominal sum which a nondefaulting party should be required to expend to mitigate damages on account of a defaulting contractor, particularly when total payment has already been made by him for completion of the contract. We can find no case requiring anywhere near such an amount to be expended under the mitigation theory. Most of those cited by defendant involved approximately $100 (one or two, perhaps, to $200). But conceding that the expenditure of $1000 to $1500 can be required in some cases, we are further of the opinion that the record does not affirmatively establish that the work mentioned could have been completed for this sum or that it would have averted the ultimate disaster.

True, Mr. Wood gave this amount as his "estimate". However, it should be observed that he carried on his business not in Crowley, but in Beaumont, Texas. There is no showing whatsoever that he was familiar with labor or material costs in Crowley or that the costs were the same in both locations. For all we know, the cost in Crowley might have been considerably more than Wood's off-hand estimate. Besides, Mr. Letz was of the opinion that "extensive remedial work" would be necessary.

Nevertheless, it is clear that in January, 1966 there was no assurance or "virtual certainty" that the recommended repairs would have corrected the difficulty. Plaintiff, a layman in the field, was confronted on January 31, 1966 with conflicting expert opinions. Even the other interested parties, most of whom were experts in their re-

spective fields, *agreed to further expert testing* to pin point the cause. And plaintiff's engineering expert had advised him in January that if further testing showed that the bottom of the pool had moved as much as the top *that complete reconstruction might be necessary.*

No more eloquent description of plaintiff's dilemma could be set forth than is asserted in the brief of the defendant to this court wherein it is stated: "In this case, where patios began to crumble, walls push up and out, and pool movement noticed, it was obvious that someone with particular skill should be called upon to determine the cause; let the chips fall where they may. All parties agreed that a soil expert be contacted to take borings and give an opinion.

"The best known soil expert in the State of Louisiana is Dr. Capozzoli from Baton Rouge, Louisiana. * * *"

And so we ask ourselves, would any reasonably prudent man, himself a layman, step in and spend $1000 to $1500, or perhaps even more, under these circumstances? We think not.

We also ask ourselves why the injured party should be compelled to take such action, at the risk of loss of all if he does not, when his contractor insists that there is no defect at all. Moreover, although the pool had been completed and delivered, the defendant was still, by a specific provision in the contract, required to "* * * remedy any defect in the workmanship of which it receives written notice within one year after connection of the filter, without additional cost to the owners * * *."

In view of this we think that the following observations of the Supreme Court of Oregon in Parker v. Harris Pine Mills, Inc., 206 Or. 187, 291 P.2d 709, 56 A.L.R.2d 382, are appropriate: "* * * However, this duty to mitigate the damages is not applicable where the party whose duty it is primarily to perform a contract 'has equal opportunity for performance and equal knowledge of the consequences of nonperformance.' In such cases, while the contract is subsisting and in force, such party cannot be heard to say that plaintiff might have performed for him. * * *" In the instant case there is no doubt that the defendant had the same opportunity to perform, and equal knowledge of the consequences of nonperformance, as did the plaintiff.

For the reasons assigned the judgment of the Court of Appeal is affirmed.