377 So.2d 1340 (1979)
Frances HEBERT et al., Plaintiffs-Appellees,
v.
WOMAN'S HOSPITAL FOUNDATION, Defendant-Appellant.
No. 12884.
Court of Appeal of Louisiana, First Circuit.
November 12, 1979.
*1341 Floyd J. Falcon, Jr., Baton Rouge, of counsel for plaintiffs-appellees Frances Hebert, et al.
Charles W. Wilson, III, Baton Rouge, of counsel for defendant-appellant Woman's Hospital Foundation.
Before EDWARDS, LEAR and SARTAIN, JJ.
SARTAIN, Judge.
This is a contractual dispute involving five certified registered nurse anesthetists (CRNA's) who formerly served the Woman's Hospital in Baton Rouge, Louisiana. They seek damages for a breach of contract from the Woman's Hospital Foundation, the corporation which operates the hospital facility, because they allegedly were not given sufficient notice of the termination of their working arrangement with that institution. The defendant appeals from an adverse judgment of the district court.
The Woman's Hospital began operation in the fall of 1968 and it was expected that most of the practice of obstetrics in this community would thereafter be done at that facility. At that time, Frances Hebert, Ruth Alford, Carol Dickinson and Cheryl Houston were working as nurse anesthetists in a free lance capacity in the obstetrical section of the Baton Rouge General Hospital. Their arrangement there was that they would be entirely responsible for providing obstetrical anesthesia and that they would make their own schedules, bill the patients individually, and provide the service on a twenty-four hour a day, year-round basis.
The quality of their work and their efficiency was known and respected by the physicians who regularly practiced there, several of whom were instrumental in the foundation of the Woman's Hospital. At the request of those doctors, those four plaintiffs all moved to the new hospital when it opened to carry on that service under the same terms and conditions as *1342 before. Virginia Poltrock later became a member of that group.
For several years the arrangement worked well; however, in time, the opinion arose among the medical staff that, because of new developments in anesthesia and because the nurses were limited in the type of anesthesia that they could administer, the obstetrical anesthesia should be under the complete control of a physician-anesthesiologist. In 1975, an ad hoc anesthesia committee was formed by the doctors to search for and contract with a physician-anesthesiologist to provide this service.
The CRNA's were informed of this action and, since they felt that their status was in jeopardy, employed counsel to represent their interests with the hospital. No written contract of employment had ever been entered into between these parties and some effort was then initiated to do so, however, no formal written agreement was ever finalized.
The atmosphere remained unsettled throughout 1975, 1976, and early 1977 as discussions were held between the hospital and several prospective anesthesiologists. The hospital personnel and staff were aware of the concern of the CRNA's as these interviews continued.
On April 19, 1977, a letter was written to each of the plaintiffs by Dr. Eugene Theriot advising them that a contract had been reached between himself and the hospital and that he exclusively would be responsible for providing obstetrical anesthesia. He also offered each of them employment with him and enclosed a proposed contract.
The CRNA's also received a letter dated April 26, 1977, from Thomas R. Hightower, the hospital administrator, which confirmed Theriot's and which further related that effective May 2, 1977, all CRNA's administering anesthesia at the hospital would have to be in the employment of Dr. Theriot. None of the plaintiffs accepted that employment and all terminated their services on May 1.
Thereafter, the plaintiffs filed this suit claiming that the hospital had given them the exclusive right to provide those services for as long as the CRNA's wished to do so. An alternative demand later arose which asserted that the hospital had agreed to give them six months' notice prior to termination. The initial claim was subsequently dropped and the case was tried as to the alternative demand only.
The district court found that the hospital had guaranteed six months' notice as alleged and that such notice had not been given. Therefore, damages were awarded to each plaintiff in the amount of six months' salary with the exception of Cheryl Houston, whose award was reduced by the sum of $1700.00, which was the amount she actually earned in the first six months following termination. We affirm.
In its written reasons for judgment, the trial court stated, in part:
"The sole question of fact here is whether an agreement existed requiring six months written notice by the hospital prior to termination of the CRNA's. This court finds that such an agreement did exist and, as a result, defendant is liable to petitioners in damages for failure to give notice prior to terminating them.
"There is evidence that a written document executed in the Fall of 1975 existed evidencing the contract which granted the six months notice provision. This document, which was purported to be in defendant's custody, was not produced at trial. However, completely outside of this testimony, there is sufficient evidence to support the finding that an agreement existed between the parties requiring the hospital to provide six months written notice prior to a change in the CRNA's status.
"Hightower testified that Dr. Jospeh (sic) P. Griffon, who was President of the Woman's Hospital Foundation, told the board of directors that the six month period was satisfactory with the CRNA's. The board of directors at its meeting on October 9, 1975, approved the recommendation that six months notice be given the CRNA's should a full-time physician be acquired to take over the Department of Anesthesia, Joint Exhibits No. 37, No. 38. At said meeting, Hightower recommended that the instrument reflecting this agreement be signed individually by *1343 the CRNA's. The petitioners testified that they signed such an agreement. This recommendation was never formally adopted by the board of directors, Joint Exhibit No. 38, but such additional action would have been merely an incidental formality.
"Additionally, there are several admissions that the six months notice provision was a viable agreement. Excerpts of the minutes of a meeting of the medical staff held on June 21, 1976, indicate that Mr. Hightower remarked that the CRNA's were to be given six months notice of any change in the set up. Joint Exhibit No. 43. Dr. Julius H. Mullins, Chief of Staff for the year of 1976, said, `. . . it's always been a feeling that a six-months notice would be given.' Deposition of Julius H. Mullins, M.D., at page 24. When Dr. J. Webb McGehee was asked if the six months notice provision was ever implemented, he said, `Mr. Hightower told me it was.' Deposition of J. Webb McGehee, M.D. at page 7 and page 10.
"This court finds that the CRNA's status as free-lance anesthetists could only be terminated six months after written notice. System Federation No. 59 of Railway Employers Dept. of A.F. of L. v. L & A Railway Co., 30 F.Supp. 909 (W.D. La.1940). Since written notice was not delivered until the latter part of April, termination could not take effect until the end of October. Labatt v. La. Adjustment Bureau, Inc., 185 So. 702 (Orl. La.App.1939)."
We find that the trial judge has correctly characterized the evidence and the intentions of the parties. There are practically no facts to the contrary. The document referred to above, which was supposedly signed by the nurses and which contained the six month notice agreement, was a copy of the minutes of a meeting of the ad hoc anesthesia committee on September 29, 1975. An unsigned copy is entered in this record as joint exhibit 37.
The last sentence of that document sets forth the promise of notice. The plaintiffs all testified that they met with the chairman of that committee, Dr. J. Webb McGehee, in the library of the hospital and that he explained that he had gotten a six month notice period for them and that it was the best he could do. Each of the nurses then signed the document and Dr. McGehee took it with him.
As noted by the district judge, Dr. McGehee's later testimony coincides with that account of events, in that he stated that he thought that the six months' notice had been given by the hospital administrator. Continued references to the notice provision are found throughout the minutes of various hospital meetings and in the testimony of those involved. There is no evidence whatsoever of its revocation or that the nurses waived their right to it.
The appellant contends, however, that only a written contract was contemplated by the parties and that since a written agreement was never entered into, that the notice provision was not enforceable as to it and, additionally, that the notice provision was never approved by the board of directors. Alternatively, it argues that six month notice of termination was given or that if any damages are allowed, that the nurses failed to minimize their damages.
These arguments are not persuasive. The record clearly indicates that, although there were discussions concerning a written contract, ultimately the plaintiffs agreed to continue as they had in the part without one and that the notice period was promised to them in lieu of a written agreement. The representatives of the hospital dictated the form and manner in which the agreement was made and the nurses accepted it, as given. The appellant cannot now say that another form should have been used so that it can escape liability herein.
Joint exhibits 3 and 4 are of particular importance. These letters and attachments which passed between hospital representatives and counsel for the CRNA's show that the ad hoc anesthesia committee recommended the notice period among other things to the board of directors and that, on October 9, 1975, the board adopted the recommendations of that committee. The only notice received by the plaintiffs of their status change were the letters from Dr. Theriot and the hospital administrator, previously *1344 referred to herein. Neither of these satisfied the six month requirement.
The appellant also contends alternatively that the plaintiffs failed to minimize their damages and that their failure to do so requires that any judgment in their favor be reduced accordingly. In Lawyers Title Insurance Co. v. Carey Hodges & Associates, Inc., 358 So.2d 964 (La.App. 1st Cir. 1978), this court said:
"The doctrine of avoidable consequences requires an injured party to take reasonable steps and exercise ordinary prudence to minimize his damages. Unverzagt v. Young Builders, Inc., 252 La. 1091, 215 So.2d 823 (1968). Full consequences of an injury are recoverable where the injured party exercises that degree of care and diligence in minimizing damages as would be taken by an ordinarily prudent individual under the same or similar circumstances. Reasonable care depends upon the circumstances attending each particular case, including time, knowledge, opportunity, exposure to further loss and the expense required to avoid reasonably foreseeable loss. Unverzagt, above."
In view of the nature of their occupation and the particular facts of this case, we do not find that doctrine to be applicable here. These nurses were free-lance professionals who practiced as did any other professional at that institution. The record as a whole compels the conclusion that another such opportunity was not available at that time anywhere else in this community or in the surrounding area and the appellant has introduced no evidence to the contrary. The hospital does suggest that the plaintiffs should have taken employment with Dr. Theriot when he assumed responsibility for the department.
The facts are, however, that Dr. Theriot stated that he could hire two or three of the nurses only and at 25% to 40% less in salary. Additionally, the nurses would no longer enjoy their independent status, but would be employees only. They were given three days to make that decision and were not made aware of their working conditions or the hours that would be expected of them. This arrangement was not an opportunity sufficiently similar to that from which their damages have arisen and does not warrant the use of the suggested doctrine as a matter of law.
The judgment of the district court is affirmed, all costs of this appeal to be paid by the appellant.
AFFIRMED.