614 So.2d 118 (1993)
BREWHOUSE, LIMITED and Brewhouse Phase II, Limited,
v.
NEW ORLEANS PUBLIC SERVICE INC.
No. 92-CA-0267.
Court of Appeal of Louisiana, Fourth Circuit.
January 29, 1993.
*119 Charlton B. Ogden, III, Ogden, Ogden & Wright, New Orleans, for defendant-appellant.
Henri Wolbrette, III, Arthur H. Leith and Leopold Z. Sher, McGlinchey, Stafford, Cellini & Lang, New Orleans, for plaintiffs-appellees.
Before BARRY, BYRNES and WARD, JJ.
BYRNES, Judge.
On May 31, 1986 a fire occurred in the electrical vault servicing the Jackson Brewery Development. Plaintiffs, Brewhouse, Limited and Brewhouse Phase II, Limited filed a claim against the defendant, New Orleans Public Service, Inc. (NOPSI) for damages caused by that fire. NOPSI's reconventional demand was dismissed with prejudice, but NOPSI does not appeal that judgment. The trial court awarded plaintiffs $443,989.79, plus legal interest and costs. It is from this award that NOPSI now appeals.

I. STATEMENT OF THE CASE
Plaintiffs Brewhouse Limited and Brewhouse Phase II, Limited were at all material times owners of Phase I and Phase II, respectively, of the Jackson Brewery development on the riverfront in the French Quarter. The two buildings adjoin each other and were developed in two phases as a "festival marketplace" shopping center.
On May 31, 1986 a fire occurred in a secured electrical vault which supplied power to both phases of the development.
NOPSI owned all the equipment located in the NOPSI transformer vault where the fire occurred. NOPSI had selected and installed the equipment located in the vault, and all the electrical connections in the vault were made by NOPSI employees. Although the concrete walls of the vault itself were designed and constructed by the owner's architect and contractor, respectively, NOPSI approved the plans for the vault and inspected and accepted the vault after the construction of the vault was completed. NOPSI maintained all the equipment in the vault and periodically inspected that equipment. The doors to the vault were louvered, screened and locked. Only NOPSI had a key to the vault. Plaintiffs had no access to the vault after NOPSI's equipment was installed and energized. The month before the fire, the equipment in the vault failed, due to improper installation by NOPSI's personnel. This failure resulted in a single phasing of the electrical service to both phases of the Jackson Brewery development for a time. NOPSI's workers allegedly repaired that problem. A month later, a fire of tremendous intensity erupted in NOPSI's sealed, locked transformer vault. The fire heavily damaged the concrete vault and spread smoke damage throughout plaintiffs' development.
At the time of the fire Phase II was under construction. Substantial completion *120 of the shell of the building had been achieved. However, the construction process relating to tenant build-out was still ongoing and was at a critical phase when the fire occurred. As a result of the fire, smoke damage was spread through Phase II, which was under construction, and also through Phase I, which was already in operation. In the wake of the fire, the extent of the damage was not immediately clear. Nonetheless, steps were promptly taken to attend to the needs of the development and ensure the continuing operation of Phase I. It proved impossible to attend to the needs of the already-operating Phase I, clean up the fire damage, and complete Phase II by the scheduled August 15, 1986 opening date. The opening of Phase II was rescheduled for the next viable date, September 27, 1986.
The trial court held that the fire was caused by the fault or negligence of NOPSI and awarded judgment in favor of the plaintiffs in the sum of $443,989.79 plus legal interest from date of judicial demand. NOPSI appeals.

II. STANDARD OF REVIEW
Our standard of review is set forth in Rosell v. ESCO, 549 So.2d 840 (La.1989); Virgil v. American Guarantee and Liability Ins. Co., 507 So.2d 825 (La.1987); and Miller v. Miller, 602 So.2d 330 (La. App. 4 Cir.1992) which stand for the following: When findings are based on determinations regarding the credibility of witnesses, the manifest-error clearly wrong standard demands great deference to the trier of fact's findings both express and implicit even though the appellate court may feel that its own evaluations and inferences are as reasonable; for only the fact finder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said.
In reviewing contrasting expert testimony, the trier of fact has the responsibility to determine which evidence is the most credible.
The reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record) but also upon the proper allocation of trial and appellate functions between the respective courts. Appellate courts must constantly have in mind that their initial review function is not to decide factual issues de novo.

III. LIABILITY
NOPSI installed its equipment and made the electrical connections in the vault in early April 1986. On April 11, 1986, Phase I and Phase II of the Jackson Brewery experienced a single phasing of their electrical service. Upon contacting NOPSI, Mr. Zimmerman, the building maintenance engineer for Phase I, was advised by NOPSI that its employees had inadvertently reversed the sensing potentials on the automatic transfer switch in the vault when it was installed and connected. Joseph Gavin, a NOPSI engineer, admitted that NOPSI's employees had installed the sensing potentials on the automatic transfer switch in a reversed position and that this caused the single phasing condition. He also admitted that NOPSI had committed a second error in the course of installation of the equipment, in that an incorrect cable was used to connect to a bypass switch. Approximately a month later, an electrical arc of great force emanated from NOPSI's equipment in the vault, causing the fire at issue in this case. Testimony was also introduced at trial, without objection, to the effect that after the fire NOPSI decided that the vault was too hot and installed an exhaust fan therein; there was no exhaust fan present in the vault before the fire.
Plaintiffs called George Hero as their expert witness. Mr. Hero is an electrical engineer with extensive experience in investigation and determination of fire cause and origin. Mr. Hero viewed the vault on June 5, 1986, only a few days after the fire occurred. He also viewed NOPSI's equipment at NOPSI's yard on Tulane Avenue a few months after the fire. That equipment had not been altered since the time of the fire and was in the same condition when *121 Mr. Hero saw it as it was shortly after the fire. When examining the vault Mr. Hero found evidence of heat of such intensity that it caused an instantaneous and explosive evaporation of the water in the concrete wall of the vault, resulting in a phenomenon known as "spalling." In his opinion, this damage was caused by an electrical arc from NOPSI's high-voltage equipment. He stated that the probable cause of this arc was "a poor connection of the primary feeders" which was made by NOPSI's employees. The arc then ignited oil and other flammable substances in the transformers in the vault, causing the fire.
Mr. Hero's explanation of the cause of the fire was logical, coherent, and consistent with his personal observation of the physical evidence. NOPSI admittedly made at least two errors in the course of installation and connection of its equipment in the vault in April 1986. In May 1986, the fire occurred. Mr. Hero testified that installation or connection errors by NOPSI's employees could be expected to manifest themselves in failure shortly after the installation. The fire occurred the month after installation and connection of additional equipment by NOPSI, and is well within this time frame. Plaintiffs affirmatively proved the probable cause of the fire.
The extraordinary intensity and destructive force of the fire made it impossible for either party to determine the cause of the fire with certainty. However, we find the following testimony by Mr. Hero credible:
Q. So you found no direct evidence of any defect in any of the equipment I take it from your testimony?
A. Well, the evidence of defect in the equipment is that we had an explosion. If there was not some defect somewhere we wouldn't have had a fire in the vault.
Q. As far as any direct evidence you found no defective equipment?
A. No, the vault is defective because it blew up but as to pinpoint a piece within the vault, no, I can't find that.
NOPSI counters that "[t]he mere occurrence of a fire does not justify the inference of negligence, since fires may occur from many separate and distinct causes." Toussant v. Guice, 414 So.2d 850, 854 (La. App. 4 Cir.1982). However, in Toussant the court pointed out that:
In the present case, the uncontradicted evidence establishes that neither the defendants nor any of their agents (the construction workers) were on the premises at all on the day of the fire. The site contained no combustible materials and was kept in an extraordinarily clean condition. There was no gas or electricity connected to the property. By plaintiff's own admission, on the other hand, vandals had entered the premises on at least two occasions. The inference that the fire was accidentally or intentionally caused by vandals is at least as reasonable (if not more reasonable) as the inference that it was caused by defendant's negligence. We therefore cannot apply the doctrine of res ipsa loquitur. Toussant, 414 So.2d at 854.
That is very different from the instant case. Here only NOPSI had access to the vault. The fact that the vault was entirely successful in containing this fire of extraordinary intensity is proof of structural integrity and inviolability.
NOPSI complains that the trial court should have preferred the testimony of its experts, Mr. Gavin and Mr. Brooks. But it is the function of the trial court, to choose between the conflicting testimony of experts. Miller v. Miller, 602 So.2d at 332. Mr. Hero's testimony was not so internally inconsistent, implausible, nor so contradicted by documents or objective evidence that a reasonable fact finder would not credit his story. Rosell v. ESCO, 549 So.2d at 845. NOPSI's theory that a rat somehow got into the well sealed vault and managed the difficult and perilous climb to the top of the electrical equipment where it succeeded in coming into contact with the live components in just such a way as to cause the electrical fire not only does not seem probable, it hardly seems possible. There was no evidence of rat droppings the last time the vault was inspected prior to the fire. The trial court was not manifestly *122 erroneous in rejecting NOPSI's theory.[1] The trial court committed no error in refusing to take judicial notice of rodents being a problem on the river.
We hold that NOPSI had a duty to the plaintiffs which it breached, regardless of whether the breach is characterized as a defect in the equipment or a loose connection. This breach caused damage to the plaintiffs for which NOPSI is liable.

IV. QUANTUM

A. The Award of Construction Loan Interest and Lost Rents Constitutes Double Recovery

The trial court awarded plaintiffs non-interest damages totaling $329,425.27 and damages for 43 days of construction loan interest from August 15 to September 27 at a rate of $2,775.90 per day, totaling $119,363.52. This figure represented interest on a construction loan with the Hibernia Bank which at all relevant times had a principal balance in excess of $10½ million. Only the pay off of that balance would have prevented plaintiffs from incurring the $119,363.52 interest expense. For defendant NOPSI to have been responsible for this loss, the delay caused by NOPSI would have had to have cost plaintiffs an amount in excess of $10½ million which plaintiffs could have otherwise used to pay off the construction loan. Clearly, plaintiff's non-interest damages of $329,425.27 were inconsequential relative to a loan balance of over $10½ million, and could not have prevented plaintiffs from paying off at least $10 million of the loan balance. Plaintiffs failed to prove that had the fire not occurred and had they been able to open the Brewhouse on August 15, that approximately $10½ million would have suddenly materialized on that date enabling them to pay off the construction loan and stop the accruing of interest. The only things that plaintiffs have proven would have been different economically had they been able to open on August 15 were that they would have collected additional rents totaling approximately $105,500.00 and would not have incurred certain expenses totaling approximately $224,000.00. They received full credit for both in the judgment of the trial court. It is not as though plaintiffs showed that the $10½ million was paid off on September 27 and then argued that they would have paid it off on August 15 were it not for the fire. Mr. Charles Riels, plaintiffs' chief financial officer, testified without contradiction that:
A. ... after it was constructed we sought permanent financing and obtained permanent financing to take out a portion of the construction loan.
Q. How was the balance of the construction loan paid off?
A. It was never paid off. it was funded by Mr. Berger and it was never paid off. (Emphasis added.)
Mr. Riels' testimony was corroborated by that of Mr. Darryl Berger, the developer and major owner of the project. If plaintiffs could show that permanent financing were cheaper (e.g., a lower rate of interest) than construction financing, the most plaintiffs could collect would be the net difference in cost of the two types of financing, if any, for the period of the delay, not the gross amount of construction loan interest. Plaintiffs made no such allegations and made no such showing. It was error for the trial court to make any award to plaintiffs for construction loan interest as this constitutes double recovery.
*123 If plaintiffs had the funds to pay off the loan on August 15 thereby stopping the further accrual of interest, but did not do so, then they failed to mitigate their damages and NOPSI cannot be held responsible. If plaintiffs were to claim that they had an agreement to sell the property on August 15 the proceeds from which would have been used to pay off the loan, then they might be entitled to interest if the sale were postponed to September 27. However, in that event they could not claim lost rents for the period from August 15 to September 27, for had the sale been consummated on August 15 the new owner would be entitled to all rents thereafter.
Rent represents the return on the $10½ million and loan interest represents the cost of the 10½ million. They are just flip sides of the same coin. Plaintiffs are not entitled to a return on the $10½ million in the form of rent without first paying for the $10½ million. To do otherwise results in a double recovery. Perhaps this would be easier to understand if we were to assume that plaintiffs borrowed $10½ million at 10% and invested it in a $10½ million certificate of deposit at 10%. It is apparent that if plaintiffs get both the interest on the C.D. and the interest expense for the borrowed money, there is a double recovery. Plaintiffs are not entitled to interest without paying interest. Substitute rent for the interest earned on the C.D. and it is improper for the trial court to award both rent and interest expense.
We, therefore, disagree with the decision of the First Circuit in Hemenway Co., Inc. v. Bartex, Inc. of Texas, 373 So.2d 1356, 1359 (La.App. 1 Cir.1979), writ denied 376 So.2d 1272 (La.1979), where the court was beguiled by the testimony of plaintiff's president and awarded plaintiff both rents and construction loan interest for the period of construction delay:
"... [T]he permanent financing payments were not affected by the delay in completion; and that Hemenway would pay the same amount in permanent financing whether the building was completed in October 1973, March 1974 or May 1974. However, he added that the delay in the completion of the building and, consequently, a commensurate delay in the commencement of the payments on the permanent financing, meant an additional interest expense on the interim financing...."
Additionally, we distinguish Hemenway by pointing out that in the instant case, plaintiffs failed to prove that the terms and costs of any permanent financing were fixed and immutable such that they would remain constant whether Phase II opened on August 15 or September 27, the only variable being the amount of construction loan interest that would accrue depending on which date the development opened.
Plaintiffs' chief financial officer, Charles Riels, acknowledged the reciprocal nature of rents and loan interest when cross-examined:
Q. Now, on to the interest. Had the project opened up on August 15th how would the loan principal amount have been paid off and the interest thereon?
A. Had it opened up on August the 15th as it opened on September the 27th the construction loan was paid off by a permanent loan.
Q. How was the permanent loan paid off?
A. Periodic payments throughout the term of its existence.
Q. From what funds?
A. From the operational income from that property.
Q. From rental income?

A. From rental income. (Emphasis added).

B. The Findings Of The Trial Court On The Other Quantum Issues Were Not Manifestly Erroneous

The trial court found that the fire in the NOPSI controlled electrical vault caused the plaintiffs to delay the opening of Phase II from August 15 until September 27 for a total of 43 days, even though plaintiffs did not establish that it took an extra 43 days to get the project to a state of physical readiness equivalent to that projected for August 15 had the fire not occurred. Plaintiffs produced sufficient evidence to *124 establish the probability that the projected opening date prior to the fire of August 15 could be met, but that the fire caused sufficient disruption and smoke damage that the August 15 deadline could no longer be met even though power was restored the next day by means of emergency generators. The testimony describing consternation and panic among tenants and prospective tenants was vivid and believable. Plaintiffs' explanation that the Grand Opening of Phase II had to then be pushed back to September 27 so as not to be overshadowed by the intense marketing and publicity that could be expected to accompany the Labor Day weekend opening of the Rouse Riverwalk project is also reasonable. On the other hand it is not reasonable to require plaintiffs to open Phase II on the very first day after August 15 that it was physically able to do so, when to do so would have been a marketing disaster. Although the trial judge did not explicitly make these findings in her reasons for judgment, they are implicit throughout and obvious from the record. We find no error. Virgil, 507 So.2d at 826.
We also find no manifest error in the trial judge's decision regarding the following items of damages granted or denied by the trial court:
1. Granted$15,575 to cover the insurance deductible.
2. Denied$76,340 to cover painting, etc., denied by the insurance carrier, for which inadequate documentation was provided, and which is subject to litigation in other proceedings.
3. Granted$22,756.75 in additional advertising cost since it was necessary to rework the entire advertising campaign.
4. Granted$2,255 for lost percentage rents for the 24 hour period before power could be restored.
5. Granted$103,311.63 for lost rents in Phase II.
6. Granted$80,527.89 for overhead expenses to the Jackson Brewery Development Company.
NOPSI makes the disingenuous argument that the measure of damages should be lost profits; that the Brewhouse Phase II was not profitable; therefore, it could sustain no damages. Using NOPSI's reasoning, a break even business that starts losing $10,000/month suffers no loss, while another business making profits of $1,000/month that starts losing $10,000/ month is only losing $1,000, its loss being limited only to lost profits. However, when you hit zero it doesn't mean you've hit the bottom. Plaintiffs are entitled to recover for loss of income and extra expense incurred as a result of the fire.
We also find no manifest error in the implicit finding that plaintiffs exercised good faith and diligence in attempting to minimize their damages. Unverzagt v. Young Builders Inc., 252 La. 1091, 215 So.2d 823 (1968).

V. IT WAS NOT ERROR FOR THE TRIAL COURT TO CONSTRUE THE TERM "CONSTRUCTION DELAYS" BROADLY
We agree with the trial court that the term "construction delays" used in plaintiffs' petition is broad enough to include design, planning, and other facets of bringing the Brewhouse Phase II to fruition. The construction process includes more than bricks and mortar. Expense figures annexed to plaintiffs' answers to interrogatories among other things makes this obvious.
"A trial court has the discretion to admit or disallow evidence subject to an objection based upon the scope of the issues and pleadings. Additionally, it is discretionary for the trial judge to determine whether evidence is encompassed by the general issues raised in the pleadings." Brannon v. Boe, 569 So.2d 1086 (La.App. 3 Cir.1990). See also Coleman v. Coleman, 541 So.2d 1003 (La.App. 3 Cir.1989).
In Cooper v. AMI, Inc., 454 So.2d 156, 160 (La.App. 1 Cir., 1984), writ denied 459 So.2d 539 (La.1984) the court stated that:
Whether evidence is within the general issues raised by the pleadings is usually a matter left to the discretion of the trial court. Kuhn v. Marshall Exploration, Inc., 337 So.2d 561 (La.App. 2d Cir.1976), writ denied 339 So.2d 854 (La.1976).
*125 The trial court's denial of defendant's "Motion In Liminine" which focused on this issue was not an abuse of discretion. NOPSI was not prejudiced. NOPSI could have moved for a continuance, or it could have used the weeks prior to trial to obtain information.

VI. THE FACTS PLEADED BY PLAINTIFFS WERE SUFFICIENT TO ENCOMPASS THEORIES OF RES IPSA LOQUITUR AND STRICT LIABILITY
In First South Production Credit Association v. Georgia Pacific, 585 So.2d 545, 548 (La.1991) the court stated that:
The lower courts should indeed have considered... alternative arguments or theories of recovery. Louisiana's Code of Civil Procedure establishes a system of fact pleading. As long as the facts constituting a claim are alleged, the party may be granted any relief to which he is entitled under the pleadings and the evidence; the "theory of the case" doctrine, under which a party must select a theory of his case or defense and adhere to it throughout the litigation, has been abolished. See C.C.P. art. 862; Cox v. W.M. Heroman, & Co., 298 So.2d 848 (La. 1974); Royal Furniture Co. of Baton Rouge v. Benton, 260 La. 527, 256 So.2d 614 (La.1973).
Plaintiffs allege in their Petition that: On or about May 31, 1986, a fire occurred at the Jax Brewery. This fire was caused by a vice or defect in an electrical transformer. The transformer in question was at all times under the sole custody and/or control of defendant NOPSI.

NOPSI argues that this allegation is insufficient to support recovery by the plaintiff based upon theories of res ipsa loquitur and strict liability. No one attributes the cause of the fire to spontaneous combustion. We are not convinced that a rat caused the fire. That leaves a defect in the electrical equipment or its connections as the only other reasonable explanation. This equipment was of great technological complexity. That the nature of the defect determined at the trial is different from that initially suspected by the plaintiffs should not be surprising, nor a bar to recovery. Plaintiffs specifically referred to the "... sole custody and/or control of defendant NOPSI" which should have alerted NOPSI to the potential for strict liability and/or the application of the doctrine of res ipsa loquitur. It is obvious from the record that NOPSI's defense would have been the same in any event, and that NOPSI can show no prejudice.
The explanation of res ipsa loquitur found in 34 Tulane L.Rev. 409, 410 (1960) is appropriate:
The doctrine of res ipsa loquitur is based upon the theory that the party in charge of the instrumentality causing the injury either knows or has the better opportunity to ascertain the cause of the accident. The plaintiff, having no such knowledge, is required only to allege negligence in general terms and prove the fact of the accident and his resulting injury. Thus, where the instrumentality that caused the injury is shown to be under the actual or constructive control of the defendant or his servants, and the accident is such as in the ordinary course of events does not happen if those who control the instrumentality use proper care, the happening of the accident itself affords reasonable evidence that the accident arose from want of care.
NOPSI had "custody" as that term is used in LSA-C.C. art. 2317. NOPSI therefore, is strictly liable for any "vice" therein "... unless [it] prove[s] that the damage was caused by the fault of the victim, by the fault of a third person, or by an irresistible force." Loescher v. Parr, 324 So.2d 441, 449 (La.1975). NOPSI did not succeed in making any such showing. See also: "Strict Liability For Damage Done By Things In One's Possession", 51 Tulane L.Rev. 403 (1977).

VII. THE TRIAL COURT WAS NOT MANIFESTLY ERRONEOUS IN DISCOUNTING THE WEIGHT IT GAVE TO THE NOPSI LOG
The trial court properly allowed NOPSI to introduce the daily log of operations *126 of feeders into evidence as a business record exception to hearsay in support of NOPSI's argument that there had been the type of simultaneous relay of circuit breakers that would have occurred if a rat had caused the electrical arc as NOPSI contended. Since the log was recorded manually by a NOPSI employee and was not recorded mechanically, the trial court discounted this evidence as being "merely self-serving." NOPSI complains that "it was adversarial and unreasonable for the trial court to interject its own objection to the evidence offered" when plaintiffs had raised no objections. NOPSI confuses objections to admissibility with weight and sufficiency. The trial judge did not rule the evidence inadmissible. She explained why it did not impress her. We find nothing in the record for us to reach the same conclusion, but the demeanor of the witnesses may have caused the trial judge to discount NOPSI's evidence. We cannot say that the decision of the trial judge was clearly erroneous. Moreover, even had the court accepted the NOPSI log at face value, plaintiffs' theory of the case is more convincing. The log was only accurate within one minute. According to the completely credible testimony of plaintiffs' expert, Mr. Hero, it would have taken less than one minute for the fire to have started under plaintiffs' theory.

VIII. THE RECORD DOES NOT SUPPORT NOPSI'S ALLEGATIONS OF BIAS BY THE TRIAL JUDGE
NOPSI's allegations of bias by the trial court seem explicitly and implicitly to fall into three categories: (1) the trial court refused to adopt the unnecessarily restrictive definition of "construction delay" urged by NOPSI; (2) the trial court refused to allow NOPSI to introduce unlimited amounts of repetitious, cumulative testimony largely concerning its "rat" theory of causation; (3) and NOPSI was generally dissatisfied with the outcome of the trial.
We have reviewed the entire record on this issue. We note rulings on evidentiary and discovery issues adverse to both plaintiffs and NOPSI. We found no instance of the trial court using language that was abusive or discourteous. We also note that the trial court denied a substantial portion of the damages claimed by plaintiff.
Ultimately, NOPSI's argument seems to boil down to a complaint that the trial judge felt, as does this Court, that plaintiffs' case was stronger on the facts and the law.

IX. DECREE
For the foregoing reasons we reverse that portion of the judgment which awards construction loan interest in the sum of $119,363.52. We affirm the balance of the judgment.
REVERSED IN PART AND AFFIRMED IN PART.
BARRY, J., concurs.
NOTES
[1] The trial court was in error in telling NOPSI that it wanted to receive evidence regarding only the probable cause of the fire, not possible causes. Plaintiffs' expert testified that the probable cause was a loose connection. Where the cause is unknown it is not necessary for defendant to disprove plaintiffs' contention by proving what did cause the fire. Defendant may be able to show that there were sufficient other possibilities that plaintiffs' contention can no longer be assumed to be probable, without ever proving what was probable. The burden is on plaintiffs to prove their case. However, we find that the lower court's application of an erroneous standard was harmless error. The trial court allowed more than enough of NOPSI's evidence into the record to be fully familiar with all of NOPSI's theories of causation. Moreover, we found nothing in the evidence proffered by NOPSI that, had it been deemed admissible, would have made any material difference. It consisted largely of repetitious, cumulative testimony about NOPSI's "rat" theory. This was not a jury trial.