No. 06-30774

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 7, 2007

Charles R. Fulbruge III
Clerk

No. 06-30774

Ralph R. Mabey

Appellee

v.

Dixie Electric Membership Corp.

Appellant

Appeal from the United States for the Middle District of Louisiana, Baton Rouge Division
USDC No. 3:06-CV-11

Before DENNIS, CLEMENT, and PRADO, Circuit Judges.

PER CURIAM:[*]

Plaintiff Mabey, as bankruptcy trustee for Cajun Electric Power Cooperative ("Cajun"), sued to recover $2,754,760.04 for 39 months of electricity received by defendant Dixie Electric Membership Corporation ("DEMCO") but unmetered (and therefore not billed) by Cajun until a calibration error in a transformer at a power substation was discovered. The bankruptcy court granted Cajun's motion for summary judgment and denied DEMCO's motion; the district court affirmed without oral argument. After review of the record and the parties' arguments, we agree. The judgment of the district court is therefore AFFIRMED.

## I.

Cajun is a nonprofit corporation that generates and transmits electricity to members of the cooperative as well as non-members. The cooperative's members, including DEMCO, are also

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

non-profit electric distribution cooperatives, who sell and distribute power to the end consumer. DEMCO was required by a contract known as the 1976 Wholesale Power Supply Agreement ("WPSA") to purchase from Cajun at wholesale all of its electric power requirements. The WPSA contains, *inter alia*, the following provisions:

> 1. GENERAL. The Seller [Cajun] shall sell and deliver to the Member [DEMCO] and the Member shall purchase and receive from the Seller all electric power and energy which the Member shall require for the operation of the Member's system to the extent that the Seller shall have such power and energy and facilities available; provided, however, that the Member shall have the right to continue to purchase electric power and energy under any existing contract or contracts with a supplier other than the Seller during the remainder of the term thereof. If the Member continues to purchase electric power and energy under a contract or contracts with a supplier or suppliers other than the Seller, then the power and energy purchased under such contract or contracts shall be paid for by Seller for the account of the Member, and the Member shall be billed by Seller for such power and energy in accordance with the terms and conditions of [Article] 4 hereof.
>
> 3. DELIVERY FACILITIES. The Seller shall be responsible for the facilities to deliver power and energy to the Point or Points of Connection [e.g., a power substation]. The Member shall be responsible for providing the facilities necessary to take and use the power and energy from the Point or Points of Connection. The parties shall provide and maintain, or cause to be provided and maintained, switching and protective equipment which may be reasonably necessary to protect the system of the other. Meters and metering equipment shall be furnished, maintained, and read, or caused to be furnished, maintained, and read, by the Seller.
> 4. RATE. .... The Member shall pay the Seller for all electric power and energy furnished hereunder at the rates and on the terms and conditions set forth in Rate Schedule A....
>
> 6. METER TESTING AND BILLING ADJUSTMENT. The Seller shall test and calibrate or cause to be tested and calibrated meters by comparison with accurate standards at intervals of twelve (12) months. The Seller shall also make or cause to be made special meter tests at any time at the Member's request. . . . The readings of any meter which shall have been disclosed by test to be inaccurate shall be corrected for the ninety (90) days previous to such test in accordance with the percentage of inaccuracy found by such test. If any meter shall fail to register for any period the Member and the Seller shall agree as to the amount of energy furnished during such period and the Seller shall render a bill therefor.

In the 1990s, DEMCO built the Vignes power substation; although constructed by DEMCO alone, the facility was jointly owned by DEMCO and Cajun. Entergy, per a contractual arrangement with Cajun, provided electricity through the substation to DEMCO for further distribution. The station had two meters: one, a "high side" meter, belonged to Cajun and measured electricity coming

into the station from Entergy's lines; the other, a "low side" meter, belonged to DEMCO and measured the electricity DEMCO received for distribution.

The station became operational in September 1996. At that time, it is undisputed that Cajun's meter was incorrectly calibrated, such that it registered only half of the electricity entering the substation. Cajun's resulting bill to DEMCO therefore covered only half of the electricity provided. DEMCO, however, had a properly calibrated meter and was charging its customers for the full amount of electricity provided. The problem continued for 39 months until, in December 1999, an Entergy employee discovered the problem.

The meter itself was corrected the same day. Entergy and Cajun executed a plan under which Cajun reimbursed Entergy for Entergy's share of the unmetered electricity delivered to DEMCO. In January 2000, Cajun made written demand on DEMCO for the unmetered electricity received but not billed, a total value of $2,754,760.04. The following month, DEMCO tendered a check for $179,483.82, citing to a provision under the WPSA known as the "reach back" provision that, DEMCO claimed, limited its liability for excess electricity to the excess received during the 90 days prior to discovery of the error. Cajun refused tender; the company subsequently underwent a bankruptcy reorganization.

On February 17, 2003, the bankruptcy trustee sued DEMCO as a part of an adversary proceeding related to Cajun's declaration of bankruptcy under Chapter 11. The trustee sought to recover the entirety of the $2,754,760.04, asserting three different bases for recovery: (1) breach of contract; (2) indemnity (for the payments Cajun made to Entergy for the power sold to DEMCO); and (3) unjust enrichment. The trustee moved for summary judgment on the issue of liability in January 2005; DEMCO responded with a motion to dismiss for failure to state a claim or, in the alternative, for summary judgment. In September 2005, the bankruptcy court granted summary judgment for Cajun. DEMCO appealed both the grant of Cajun's motion and the denial of its own; at the same time, it also asserted that an order of the Louisiana Public Service Commission barred Cajun from seeking reimbursement for billing errors over six months old. In June 2006, the district court, without oral argument, affirmed the judgment of the bankruptcy court. DEMCO timely appeals.

## II.

We review the bankruptcy court's grant of a motion for summary judgment de novo. *In re: Ark-La-Tex Timber Co.*, 482 F.3d 319, 328 (5th Cir. 2007). Summary judgment is appropriate where the record shows "that there is no genuine issue as to any material fact and that the moving party is

entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Facts and inferences reasonably drawn from those facts should be taken in the light most favorable to the non-moving party. *Ark-La-Tex*, 482 F.3d at 329 (citing *Duckett v. City of Cedar Park*, 950 F.2d 272, 276 (5th Cir. 1992)). Where the non-moving party fails to establish "the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," no genuine issue of material fact can exist. *Celotex*, 477 U.S. at 322-23. "If the moving party meets the initial burden of showing there is no genuine issue of material fact, the burden shifts to the non-moving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial." *Ark-La-Tex*, 482 F.3d at 329 (citing *Allen v. Rapides Parish Sch. Bd.*, 204 F.3d 619, 621 (5th Cir. 2000)).

## A.

As a preliminary matter, DEMCO asserts that Cajun lacks standing to bring suit, arguing that under the WPSA, DEMCO is required to compensate Cajun only for the power provided by Cajun. Since the surplus energy was in fact provided by Entergy, DEMCO argues, under the language of Articles 1 and 4 of the WPSA, Cajun has no contractual right to seek payment from DEMCO for electricity provided by Entergy.

DEMCO's argument fails. Even assuming, *arguendo*, as DEMCO urges that its principal obligation is to Entergy as the actual supplier, Louisiana law unequivocally establishes that Cajun is legally subrogated to Entergy's claim because Cajun has already entirely reimbursed Entergy for that company's share of the unmetered electricity. *See* LA. CIV. CODE ANN. art. 1829(3) ("Subrogation takes place by operation of law: . . . [i]n favor of an obligor who pays a debt he owes with others or for others and who has recourse against those others as a result of the payment[.]"); *see also State Farm Mut. Auto. Ins. Co. v. Berthelot*, 732 So.2d 1230, 1233 (La. 1999) ("Subrogation is a legal fiction whereby payment by a third person . . . extinguishes an obligation of the original creditor. The third person then steps into the shoes of the original creditor, acquiring the right to assert the actions and rights of the original creditor."). To the extent DEMCO argues that the record is devoid of evidence that Cajun paid Entergy for the electricity sold to DEMCO, the record belies that assertion: Mr. Elmer, Cajun's vice president for operations, testified before the bankruptcy court that Cajun had determined that Entergy was owed payment for its share of the delivered electricity and that Cajun accordingly reimbursed Entergy. DEMCO offers no evidence to rebut that testimony. We therefore hold that Cajun has standing to bring this suit.

## B.

On appeal, DEMCO argues that LA. CIV. CODE art. 2002, which requires an obligee to undertake reasonable efforts to mitigate damage resulting from an obligor's failure to perform, bars Cajun's recovery because Cajun has not mitigated its damages. We disagree.

The Louisiana Supreme Court has held that "[the] duty to mitigate . . . damages is not applicable where the party whose duty it is primarily to perform a contract 'has equal opportunity for performance and equal knowledge of the consequences of nonperformance.'" *Unverzagt v. Young Builders, Inc.*, 215 So.2d 823, 828 (La. 1968) (quoting *Parker v. Harris Pine Mills, Inc.*, 291 P.2d 709, 717 (Or. 1955). Moreover,

> [t]he injured person need not make extraordinary efforts or do what is unreasonable or impracticable in his efforts to minimize damages; reasonable diligence and ordinary care are all that is required to allow full recovery of all damages caused by the defendant's wrongful activity. More completely stated, the consequences of an injury are recoverable where the injured party acts with such care and diligence as a man of ordinary prudence would under the circumstances, and his efforts to minimize damages are determined by the rules of common sense, good faith, and fair dealing. What constitutes reasonable care depends upon the circumstances of the particular case, taking into consideration time, knowledge, opportunity, and expense.

*Id*. at 825-26. The record indicates that once Cajun was notified of the problem by Entergy personnel, it took immediate steps to correct the issue: the meter was corrected that same day. In other words, Cajun appears to have taken the proper steps to mitigate as soon as it was aware that the problem existed.

DEMCO, furthermore, admits that it knew that it was receiving twice the electricity it was paying for but argues that Cajun knew about the problem before Entergy's report. DEMCO asserts that it notified Cajun of the error at the outset, relying on testimony from Mr. Lindsley, its Vice President of Engineering and Operations. Mr. Lindsley testified that he believed DEMCO, in the person of Mike Landry, DEMCO's Construction Supervisor at Vignes, informed Bob Bayley, Cajun's Manager of Engineering and Maintenance at Vignes, of the error. During his deposition, however, Mr. Landry denied ever having a conversation with Mr. Bayley about the meter reading error. In short, no one could personally testify as to who personally informed Mr. Bayley of the metering error. On the other hand, Mr. Elmer testified that had Cajun been informed of the error, Mr. Elmer would have taken immediate action to correct the problem. In fact, that is precisely what occurred when Entergy notified Cajun of the error. The record does not, therefore, establish that DEMCO ever notified Cajun of the error such that Cajun should have begun mitigating damages at an earlier point in time.

DEMCO also argues, however, that the error resulted from Cajun's breach of Article 6 of the WPSA, which places responsibility for testing and calibration of the high-side meters with Cajun. Because Cajun did not set the proper transformer ratio and because Cajun failed to detect the error during routine testing, DEMCO asserts, Cajun breached its duties under the WPSA and therefore DEMCO is not responsible for the unmetered electricity it received. DEMCO cites no authority for the proposition that Cajun's error in failing to detect the error at the time the station became active precludes later recovery for DEMCO's breach of the WPSA terms requiring it to pay for all energy furnished to it by Cajun. Even assuming, however, that the duty to mitigate reaches back to the time of the initial error, it is not clear that Cajun's actions were deficient. The record indicates that the company performed its standard yearly tests at the station. Mr. Elmer testified that to detect the calibration error, the entire substation would have needed to be taken out of service. Mr. Elmer also testified that the only reason Entergy was able to detect the error without a complete shut-down was because its employee was using a recently acquired piece of specialized equipment. Given that evidence, it cannot be said that Cajun failed to perform any of the routine checks required of it under the WPSA. Furthermore, to the extent DEMCO is arguing that such a shut-down should have been performed, Cajun is only required to mitigate as a reasonable person would have done in those circumstances. *Unverzagt*, 215 So.2d at 825. With no notice from DEMCO that there was an error in the meter's calibration, a reasonable person would not have undertaken to shut the entire substation down to test that calibration. We therefore find no failure to mitigate on Cajun's part such as would restrict its ability to recover from DEMCO.

## C.

DEMCO next argues that the error in the meter is, under the terms of Article 6 of the WPSA, an "inaccuracy" such that DEMCO must only pay Cajun for the amount of energy furnished during the 90-day period prior to the discovery of the problem. Cajun responds by asserting that the problem is, instead, better described as a "failure to register," such that the parties shall agree to the amount of electricity furnished over that period - here, 39 months - and the provider shall be reimbursed for that amount.

The bankruptcy court phrased the question as one of determining which provision of Article 6 applies to the facts of this case and held, as a matter of law, that the contract could not be read in such a way that would permit the 90-day reach back period to apply to the circumstances in this case. In other words, the bankruptcy court held that as a matter of law, this situation could only be construed as a failure to register because

[t]he 90 day reachback [sic] provision is coupled with the requirement that Cajun test and calibrate the meters at intervals of 12 months. The underlying assumption is that any inaccuracy would be revealed through testing. Also since it would be impossible to determine when a meter started to read inaccurately, the parties agreed that the billing adjustment would be limited to 90 days, thereby limiting loss by either party.

The premise underlying the 90 day reachback [sic] provision, however, does not exist in the present case. Cajun performed the required testing. The incorrect calibration, however, was not susceptible to discovery through routine testing. The defect could be discovered only if the substation were shut done [sic] for some major repair or service. As no major repairs occurred during the time period at issue, the error was not located. As this type of error could not be located during the testing referred to in Paragraph 6, the entire underlying premise of the 90-day reachback [sic] period fails.

We agree with the bankruptcy court's reasoning. Under Louisiana law, where "the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." LA. CIV. CODE ANN. art. 2046. Where a word is susceptible to "different meanings [, it] must be interpreted as having the meaning that best conforms to the object in the contract." LA. CIV. CODE ANN. art. 2048. Moreover, "[e]ach provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole." LA. CIV. CODE ANN. art. 2050.

The bankruptcy court properly determined that the meanings of the two phrases were clear. It held that as a matter of law, the type of error at issue in this case, where the meter read the information it received accurately but was, in fact, receiving the wrong information because of the wrong current transformer ratio, could only be read as a failure to register. We agree that to hold otherwise would not comport with the clear intent of the parties as expressed in the contract, which couples the 90-day reach back provision with calibration and standard testing requirements. We therefore affirm the grant of summary judgment on this issue.

## D.

Finally, DEMCO asserts that certain General Orders of the Louisiana Public Service Commission limit Cajun's ability to seek unpaid electricity to correct billing errors occurring more than six months before the discovery of the error. We disagree.

In 1975, the Louisiana Public Service Commission adopted a General Order that provides as follows:

This Commission is mindful that controversies have arisen between    utilities companies in attempting to levy charges for services furnished in the distant past, but which were not billed when furnished. Frequently, the problem has been one of a

faulty meter or meter reading or company billing errors.

The Commission feels that is [sic] should, and by this order, does formulate a guideline for institution of actions to collect sums allegedly due by reason of faulty meter or readings thereof, on Company billing errors, excepting fraud. . . .

Accordingly, this Commission hereby orders that no rate on file with this Commission and billing made pursuant thereto shall be effective against a consumer where the utility company has permitted twelve months to elapse between the rendition of the service and accurate billing therefor, incidences of consumer fraud, such as meter tampering, excepted.

The Order was amended in 1993 to reduce the time to six months.

DEMCO argues that the Order is intended to protect it from having to reimburse Cajun for anything more than six months. We disagree, for the reasons given by both the bankruptcy court and district court: the operative language in the order applies to back billing against a consumer - that is, the end user, rather than intermediate utilities like DEMCO.  In 2002, the Louisiana Supreme Court defined a "consumer" in the context of power utilities as "the ultimate user of the electricity[.]" *Cleco Evangeline, LLC v. La. Tax Comm'n*, 813 So.2d 351, 355 (La. 2002). In doing so, the court specifically excluded from that definition "the wholesaler or toller that purchases the output from the . . . plant . . . because both act as  middle persons simply transferring the electricity to others that ultimately consume the electricity." *Id.* DEMCO fits the second definition precisely; as such, it cannot receive protection clearly given to "consumers" in the express language of the order.

### III.

The bankruptcy court properly granted summary judgment in this case: by the terms of the WPSA, DEMCO is bound to reimburse Cajun for the  electricity received but not metered over the 39-month period before the error was corrected. Cajun has not failed to mitigate its damages, and the Louisiana Public Service Commission's orders do not apply to limit the period over which damages may be recovered. The judgment is therefore AFFIRMED.

**AFFIRMED.**