638 So.2d 234 (1994)
Yvonne Mackles Prestenbach, Wife of and Thomas PRESTENBACH
v.
LOUISIANA POWER & LIGHT COMPANY, INC., Arkansas Power & Light Company, Inc., and General Electric Corporation.
No. 93-CA-656.
Court of Appeal of Louisiana, Fifth Circuit.
April 14, 1994.
Rehearing Denied July 18, 1994.
*236 Val Patrick Exnicios, Samuel Richard Exnicios, John W. Redmann, Liska, Exnicios & Nungesser, New Orleans, for plaintiffs/appellants.
Eugene G. Taggart, Nora F. McAlister, Ann E. Levine, New Orleans, for defendants/appellees.
Before GAUDIN, GOTHARD and CANNELLA, JJ.
GOTHARD, Judge.
Yvonne Mackles Prestenbach filed this tort action seeking to recover for damages sustained when a twenty-five million volt transformer containing about 1400 gallons of mineral oil malfunctioned and ruptured. The resulting fire sent voluminous clouds of smoke into the air. Mrs. Prestenbach was a patron of the McDonald's Restaurant which is about one block from the power substation where the transformer was located. She was just about to enter the restaurant when she heard the explosive noise caused by the rupture of the transformer. She quickly returned to her car and fled the scene. Mrs. Prestenbach sued for physical and psychological damages sustained as a result of the incident. Her husband, Thomas Prestenbach, also made a claim for loss of consortium.
The 17' × 9' transformer was manufactured by General Electric Corporation (GE), owned by Arkansas Power & Light Company, Inc. (AP & L), and leased to Louisiana Power & Light Company, Inc. (LP & L) for use in its power substation located on West Esplanade Avenue in Metairie. All three of these parties were made defendants in this matter.
The case proceeded and as a result of information gleaned in discovery, the plaintiffs filed a First Supplemental and Amending Petition asserting that smoke released from the explosion was contaminated with PCB particles. In that petition plaintiffs asserted a claim of strict liability against all defendants and sought punitive damages pursuant to LSA-C.C. art. 2315.3. Defendants, LP & L and AP & L filed a peremptory exception of no cause of action arguing that plaintiffs' First Supplemental and Amending Petition did not state a cause of action for which relief could be granted under the provisions of article 2315.3. After a hearing on the motion, the trial court granted the exception and dismissed plaintiffs' First Supplemental and Amending Petition with prejudice. That judgment was suspensively appealed to this court. This court affirmed the ruling on the trial court grant of the exception with an amendment to the judgment not pertinent to this appeal.[1] On review, the Supreme Court amended the appeal court decision to allow the plaintiffs thirty days to amend the petition to state a cause of action.[2]
The plaintiffs filed a second Supplemental and Amending Petition alleging liability under LSA-C.C. art. 2315.3. LP & L and AP & L filed a Motion for Partial Summary Judgment asserting that plaintiffs were not, as a matter of law, entitled to exemplary damages. After a hearing on the matter, the trial court granted the motion and dismissed the plaintiffs' claims for exemplary damages under LSA-C.C. art 2315.3 against defendants LP & L and AP & L with prejudice by judgment signed on July 7, 1992. Plaintiffs sought a writ of review in this court a few days before trial on September 11, 1992. The writ was denied on the same day as an abuse of the procedural process in accordance with LSA-C.C.P. art. 2083 and Abbott v. Claiborne Parish School Bd., 550 So.2d 294 (La.App. 2nd Cir.1989),[3] and that judgment is now final.
The plaintiffs settled their claims against GE and proceeded to trial on September 14, 1992 against LP & L and AP & L. Mrs. Prestenbach's health care provider, International Union of Operating Engineers and *237 Pipeline Employers Health and Welfare Fund, filed a Petition of Intervention in this matter, but failed to present a case at trial. After a lengthy jury trial on the merits, the court rendered judgment in favor of Mrs. Prestenbach and against LP & L and AP & L in the amount of $5,600.00, being the total of special damages of $600.00 and general damages of $5,000.00. Additionally, the judgment awarded expert fees in the amount of $500.00 each to six experts who testified at trial. Further, judgment was rendered in favor of LP & L and AP & L and against Mr. Prestenbach on his claim for loss of consortium and that claim was dismissed.
Mrs. Prestenbach filed a quantum appeal. LP & L answered the appeal seeking reversal of the judgment of liability against it. Mr. Prestenbach has not appealed the judgment. Plaintiff, Yvonne Mackles Prestenbach, died during the pendency of this appeal and her survivors, Thomas Prestenbach, Margaret Jean Fraychineaud, Yvette Marie Fraychineaud McKeough and Richard Donald Fraychineaud, Jr., were substituted as parties plaintiff in accordance with LSA-C.C.P. art. 801.

LIABILITY
We will first consider the issue of liability argued by LP & L in brief to this court. LP & L contends the trial court erred in instructing the jury, and that the error resulted in an incorrect finding by the jury that LP & L was negligent.
The record shows that the trial court charged the jury in accordance with LSA-C.C. art. 2317. The court used the following charge:
Louisiana Civil Code Article 2317 provides that "We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of person (sic) for whom we are answerable, or of the things which we have in our custody.
An injured party seeking damages under Article 2317 need not prove negligence, that is, that any particular act or omission on the part of the defendant caused his injuries. He must prove that the thing which caused the damage was in the care or custody of the defendant, that the thing had a vice or defect, that is, that it occasioned an unreasonable risk of injury to another, and that his injury was caused by the defect. Once these elements are proven, the custodian can escape liability only by showing that the harm was caused by the fault of the victim, by the fault of a third person, or by an irresistible force.
LP & L argues that charge is incorrect and cites the court's refusal to give its requested jury charges numbers 10, 11, and 12 as error. Those requested charges read as follows:
"The mere fact that a transformer in defendants' custody caused plaintiffs' damages does not subject defendant to liability; plaintiff must prove that the transformer was defective, that is that (sic) condition which caused plaintiffs' damages presented an unreasonable risk of harm. In determining whether the condition presented an unreasonable risk of harm, you should consider the purpose which the transformer served, its utility and effectiveness for that purpose, the likelihood that the transformer would cause harm, the severity of the harm it was likely to cause, and the social utility of defendants' ownership and maintenance of the transformer in the condition in which it was when the damage occurred."
"Absent a showing that this transformer had some particular defect, you may find it was not defective and that the defendant, who is the owner or custodian of the transformer, is not strictly liable in this incident."
"A defect may not be presumed by the mere occurrence of an accident. In the present case where a fire has destroyed important evidence which might indicate the precise nature of the occurrence, inferences of defectiveness are permissible but not compelling. You the jury as the finder of fact may choose to draw them or refuse to draw them depending on the evaluation and weight accorded the evidence."
It is well established that adequate jury instructions are those which fairly and reasonably present the issues and which provide correct principles of law for the jury to apply to those issues. In making his charges *238 to a jury, a trial judge is not required to give the precise instructions submitted by either party, but must give instructions which properly reflect the law applicable in light of the facts of the particular case. Jones v. Liberty Mut. Ins. Co., 568 So.2d 1091, 1094 (La. App. 5th Cir.1990), writ denied 572 So.2d 72 (La.1991).
To prove liability under article 2317 the plaintiff need not allege negligence but must show: (1) the thing which caused the damage was in the care and custody of the defendant; (2) the thing had a vice or defect that created an unreasonable risk of injury to another; and (3) the defect caused the injury. Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106 (La.1990). There is an irrebuttable presumption that the custodian had knowledge of the defective condition. Once the plaintiff has established a defect and custody, the only defenses available are the fault of the victim, the fault of a third person, or causation by an irresistible force. Jones v. City of Baton Rouge, 388 So.2d 737 (La.1980). LeBlanc v. Hullinghorst Industries, Inc., 542 So.2d 642 (La.App. 5th Cir.1989), writ not considered 544 So.2d 412 (La.1989).
We find that the jury charge was a correct statement of the law and find no merit in LP & L's assignment of error in that regard.
LP & L also complains that the trial court erred in limiting the scope of the jury interrogatories to the causation and in refusing to submit to the jury the two following interrogatories:
"Did the transformer have a defect?"
"Did the defect cause injury to Mrs. Prestenbach?"
The only jury interrogatory given on the issue of causation was: "(d)o you find that the accident of September 2, 1986 made the basis of this lawsuit caused any physical and/or psychological injury to Mrs. Yvonne Prestenbach?" The only other interrogatory given concerning Mrs. Prestenbach is on the issue of quantum.
The jurisprudence is clear that proof of a defect is a requirement for a finding of liability under article 2317. We agree with LP & L that the jury interrogatories should have included such a question. As the interrogatories were presented there is no separate factual finding of liability under article 2317. However, we do not find the error to be reversible. The pertinent question involved in deciding whether reversible error has occurred is whether the jury was misled to such an extent as to prevent it from doing justice. Jones v. Liberty Mut. Ins. Co., supra. Here the jury was given the correct elements for finding liability under art. 2317 in the jury instructions, and could reasonably examine the evidence for a finding concerning liability without a separate and distinct interrogatory for each element. Thus, our review is one for manifest error. Rosell v. ESCO, 549 So.2d 840 (La.1989).
It is clear from the record, and neither party disputes the fact, that LP & L was custodian of the transformer within the meaning of article 2317. LP & L admitted that the transformer was in its custody and in service on the date of the accident and that LP & L was responsible for the maintenance.
The plaintiff presented testimony at trial from an adverse witness, Archie Norris, who is the director of system protection for Entergy Corporation, the parent company of LP & L and AP & L. Mr. Norris testified that the transformer was originally manufactured in 1962 by GE. It was purchased by AP & L. The transformer was leased to LP & L in 1986 and was installed in the Lakeshore power substation on May 16, 1986, about four months before the incident, which forms the basis of this lawsuit, occurred. When questioned about tests run on the twenty-four year old transformer, Mr. Norris was somewhat evasive. However, he stated that the normal procedure is for AP & L, as owner, to conduct the routine maintenance tests on the transformer. He stated that LP & L would have performed the electrical protective tests, such as testing of the equipment that protects the transformer, the various temperature gauges and the oil contained in the transformer. He then stated that the tests are field tests and are not documented. Thus, there are no records of any tests performed by LP & L.
*239 Maintenance tests records from AP & L made part of the record indicate that tests conducted from 1979 to 1986 led to a diagnosis of "local overheating". The tests specifically indicate that one of the gases contained in the transformer, ethane, was in a concentration of forty-two parts per million. AP & L considers thirty-five parts per million as a threshold value for further monitoring. The results of these tests were made available to LP & L. Mr. Norris testified that the test in question involves gas and oil testing and is not a "precise science". He stated that LP & L does not consider this to be a problem.
Further review of AP & L's test records dated 1981 indicate that the H1 and H3 arresters were marginal at best and should be retested in one year. Mr. Norris testified that that finding was a result of a Doble factor test of the lightening arresters, which are external to the transformer and serve to intercept or bleed off a voltage spike caused by a lightening strike to the transmission lines.
When questioned regarding the sequence of events on the day on the incident in question, Mr. Norris testified that LP & L records indicate that the transformer fuse blew at 11:40:13 a.m. At the same time three circuit breakers, one at the Lakeshore station, one at Avenue C and one at the mid-town substation switched, de-energizing all the transmission lines which would have provided a source of power to the transformer. Ten seconds later all three circuit breakers closed again allowing power to be restored to the transformer. About four minutes later at 11:44:24 a second fuse on the transformer blew. Again the same three circuit breakers tripped and cut off the power. The fire started at this time. Ten seconds later the three circuit breakers re-energized and restored power. At 11:44:55 all circuit breakers tripped out and stayed out of service. At 11:45:26 the third, and final transformer fuse blew and the entire system was out of service.
When asked for the cause of the explosion and fire of the transformer, Mr. Norris opined that there were three possibilities: small animals, an act of God, or a manufacturing defect. Mr. Norris admitted that the weather was clear that day and there was no indication that an act of God caused the explosion. Mr. Norris stated that there could have been several manufacturing defects which would account for the explosion. Since the oil tank on the transformer ruptured, there could have been a welding defect. It could have been a winding defect or a blocking defect or any number of other problems. Mr. Norris admitted that finding design defects so many years after the manufacture of a transformer was not an unusual event.
The defendant called Mr. Edmond Himel, an engineer employed by LP & L, to do substation technical maintenance. Mr. Himel testified that he was at the substation on the day of the explosion to calibrate relays in the control house. He arrived at the substation at about 11:30 and called in to the control center in Gretna. While he was on the phone, he heard a loud noise and saw that one of the fuses on the transformer was hanging and that white smoke was pouring forth from the top of it. Shortly thereafter the other two fuses blew and the fire started, throwing flames fifteen to twenty feet in the air. The fire grew and elongated causing flames to shoot up about thirty feet into the air. Those facts are verified by photographs entered into evidence which show a large fire and volumes of black smoke emanating from the substation.
Mr. Himel stated that the transformer was electrically connected to two other substations as well as the Lakeshore station. He said there was nothing he could do at that control house to disconnect the transformer after the first fuse blew, but he did tell the control center to call the fire department. He explained that this particular transformer was different because it was a mobile transformer installed to replace a transformer which was sent back to the factory to be repaired. It was hooked up differently because of its design. Mr. Himel admitted that he was unfamiliar with this type of transformer.
There is inter-office correspondence entered into evidence which indicates that LP & L experienced a transformer failure at the same substation earlier and was experiencing *240 load problems on the remaining transformer. The transformer in question was leased as a replacement to ease the load problem.
Mr. Himel testified that he examined the transformer later that day, or perhaps the next day, after the fire department put out the fire and discovered a rupture in the tank near a seam about one to one and a half feet long.
LP & L argues that the plaintiff failed to prove a defect in the transformer that presented an unreasonable risk of harm to her. Further, it argues that, since the plaintiff failed to establish which of the possible causes was more likely than not to have resulted in the transformer failure and fire, there can be no finding of liability on the part of LP & L.
In support of its position, LP & L cites Lyons v. Parish of Jefferson, 425 So.2d 955 (La.App. 5th Cir.1983), writ denied 430 So.2d 97 (La.1983), for the proposition that when, as in the instant case, the transformer is destroyed by fire, inferences of defectiveness are permissible, but not compelling. While we agree with that statement, we find that a careful reading of Lyons gives more support to the plaintiff's position than to that of the defendant. In Lyons, plaintiff sued the Parish of Jefferson for damages for injuries sustained when an electrical panel box, located in an office building owned by the Parish, exploded. Expert testimony attributed the cause of the fire to a failure of the circuit breakers. The trial court ruled in favor of the plaintiff, finding the Parish liable under LSA-C.C. arts. 2317 and 2322. In that case, 425 So.2d at 959, at this court stated:
Concerning the element of causation, we find that plaintiff has satisfied his burden of proving a "vice" in the electrical panel box under both arts. 2322 and 2317. Judgment in law suits is not based on scientific certainty but rather it is based on a preponderance of the evidence. Houston-New Orleans, Inc. v. Page Engineering Co., 353 F.Supp. 890, 894 (E.D.La.1972). In explaining the plaintiff's burden of proving causation by a preponderance of the evidence, the Supreme Court in Townsend v. State Department of Highways stated: "It is only necessary that the evidence show that it is more probable than not that the harm was caused by the tortious conduct of the defendant.... This burden of proof may be satisfied by direct or circumstantial evidence.... It suffices if the circumstantial evidence excludes other reasonable hypotheses only with a fair amount of certainty so that it is more probable than not that the harm was caused by the tortious conduct of the defendant...." (Citations omitted and emphasis added.) Townsend [v. State Department of Highways], 322 So.2d 139, 141-42 (La.1975). While, as Broussard v. Penn. Millers Mut. Ins. Co., 406 So.2d 574, 576 (La.1981) noted, a defect may not be presumed by the mere occurrence of an accident, there are cases where a defect is the only reasonable explanation for the occurrence of the injury or where there is evidence offered that tends to make improbable some other cause. Moreover, proof of a specific defect which caused the accident is not required. See, Hunt v. Ford Motor Co., 341 So.2d 614, 618 (La. App. 2d Cir.1977); Madden v. Louisiana Power & Light Co., 334 So.2d 249, 253 (La.App. 4th Cir.1976); Franks v. National Dairy Products Corp., 414 F.2d 682, 687 (5th Cir.1969); Houston-New Orleans, Inc., 353 F.Supp. 890, 894-95.
We find Brewhouse v. New Orleans Public Service, 614 So.2d 118 (La.App. 4th Cir.1993) to be helpful in the analysis of the assessment of liability in the instant case. In Brewhouse, the plaintiff sued for damages sustained when a transformer in a sealed electrical vault, which supplied power to two buildings in a French Quarter shopping complex, caught fire. The testimony on causation was inconclusive. The court used the doctrine of res ipsa loquitur to grant relief to the plaintiff. The court explained at 614 So.2d 118:
... No one attributes the cause of the fire to spontaneous combustion. We are not convinced that a rat caused the fire. That leaves a defect in the electrical equipment or its connections as the only other reasonable explanation. This equipment was of great technological complexity....
*241 The explanation of res ipsa loquitur found in 34 Tulane L.Rev. 409, 410 (1960) is appropriate:
The doctrine of res ipsa loquitur is based upon the theory that the party in charge of the instrumentality causing the injury either knows or has the better opportunity to ascertain the cause of the accident. The plaintiff, having no such knowledge, is required only to allege negligence in general terms and prove the fact of the accident and his resulting injury. Thus, where the instrumentality that caused the injury is shown to be under the actual or constructive control of the defendant or his servants, and the accident is such as in the ordinary course of events does not happen if those who control the instrumentality use proper care, the happening of the accident itself affords reasonable evidence that the accident arose from want of care.
In the instant case, plaintiff alleged strict liability and sufficient facts to assert a theory of res ipsa loquitur. See First South Production Credit Association v. Georgia Pacific, 585 So.2d 545 (La.1991). As in Brewhouse v. New Orleans Public Service, supra, the only reasonable explanation for the explosion is a defect or vice in the mobile transformer or its connection. We do not find the other two possibilities, small animals or act of God, to be probable. LP & L had custody within the meaning of Article 2317 and is strictly liable for any "vice" therein unless it proves that the damage was caused by the fault of the victim, a third party, or an irresistible force. Loescher v. Parr, 324 So.2d 441 (La.1975). LP & L made no such showing. Therefore, we find LP & L liable for plaintiffs injuries.

DAMAGES
Plaintiff asserts that the damages awarded were insufficient to fairly compensate her for her injuries and the award represents an abuse of discretion. As stated earlier in this opinion, the jury awarded a total of $5,600.00 in damages. Of that total, $600.00 was awarded for special damages and $5,000.00 was awarded for pain, suffering and mental anguish.
The testimony of Mrs. Prestenbach reveals that on September 2, 1986, at the time of the explosion, she was in the parking lot of the McDonald's restaurant on Severn at West Esplanade Avenue in Metairie, about one block away from the substation. She had stopped at McDonald's to get a coke. She parked her car in the parking lot of the restaurant, got out and began walking toward the entrance. As she did so she heard a loud explosion. Smoke filled the parking lot making it difficult to breathe. Mrs. Prestenbach returned to her car and fled the smoke-filled parking lot in an hysterical state of mind. Mrs. Prestenbach testifies that at the time of the explosion, she thought the McDonald's exploded and she felt guilty about leaving without helping the children who were, no doubt, in the restaurant. When she arrived at home she was informed by a neighbor that the explosion had not originated in the McDonald's as she thought, but rather at the LP & L substation nearby. The anxiety did not abate and Mrs. Prestenbach was still convinced that the McDonald's had exploded seriously injuring the patrons.
Mrs. Prestenbach testified that when she arrived at home her face, arms and eyes were burning. She heard a news report from the poison control center that advised anyone who came in contact with the smoke to wash thoroughly and to seek medical help if experiencing breathing difficulties. Heeding that advice, Mrs. Prestenbach bathed and drove herself to East Jefferson Hospital where she received breathing treatments and injections. She was subsequently able to contact her husband, who came to the hospital to pick her up after she was released.
When she got home, Mrs. Prestenbach was still experiencing burning sensations on her face and sat in front of the air-conditioner to relieve the symptoms. Later that night after her husband and son were asleep, Mrs. Prestenbach again had trouble breathing. Not wishing to disturb her family, she drove to Doctor's Hospital. The doctors there treated her for burns of the face and eyes and gave her additional breathing treatments. She made a third trip to the emergency room the next day when she returned to East Jefferson Hospital. On this occasion she was admitted and treated for emotional as well as physical problems.
*242 Mrs. Prestenbach stated that she continued to have visions of children injured in McDonald's. In spite of reassurance that it was not necessary, she made repeated requests of the hospital personnel and family members to return to McDonald's to help the children. Mrs. Prestenbach also stated that she was frightened by the news that the smoke contained PCB's and "begged" the doctors to test her for cancer. Mrs. Prestenbach testified that she was diagnosed as having brain cancer subsequent to this incident, although she did not testify as to the cause of the cancer.
A summary of Mrs. Prestenbach's physical and mental medical history read into the record indicates that Mrs. Prestenbach has had extensive problems in both areas. Pertinent to this matter is the fact that she has had asthma virtually all of her life. Her medical records show several periods of hospitalization for respiratory ailments. She also was a smoker for most of her life. She has been treated for gastric problems since 1972, and in 1976 was diagnosed as having a duodenal ulcer. In 1977 those problems continued and a gastronomy was performed in connection with an ulcerated duodenum. In 1982 she developed a bleeding peptic ulcer. Her medical records show her gastric problems continued up to the time of the fire.
As to her mental state, Mrs. Prestenbach also has a long history of problems. In 1968, when she was about twenty-six years old, she had a nervous breakdown and was hospitalized in Charity Hospital for seven weeks. Serious family problems in 1972 caused her to take an overdose of sleeping pills for which she was treated at Hotel Dieu Hospital. In November, 1979 she had an emotional crisis at Chalmette General Hospital when she thought she saw people being chopped up in a fan. Mrs. Prestenbach explained that the medication given to her at Chalmette General caused her to see "weird things". In 1983 she was treated for attempted suicide and severe depression. She was having visions of her dead brother and she was also having certain family problems. She was transferred to Southern Baptist Hospital for further treatment. In 1984 she was again admitted to Southern Baptist Hospital with a primary diagnosis of depression when she showed up at the emergency room with a gun she brought to kill herself. She was discharged about three weeks later.
Plaintiff's counsel stipulated to the reading of the summary of Mrs. Prestenbach's medical history to save her the lengthy testimony. Mrs. Prestenbach did state that she had no mental or respiratory problems between 1984 and 1986.
The plaintiff also offered testimony from Dr. James Maher, an expert in the field of gastroenterology. He stated that he treated Mrs. Prestenbach at East Jefferson Hospital on September 4, 1986. Mrs. Prestenbach was referred to Dr. Maher by her family doctor. Dr. Maher testified that, before he examined her, she had been to the emergency room complaining of respiratory problems on three occasions in the previous forty-eight hours as a result of inhaling smoke from the fire of a transformer. Dr. Maher stated that the results of his examination revealed that she had inspiratory wheezing and rhonchi in all lung fields. She was treated with IV Aminophyline, inhalation treatment and oral antibiotics. She was admitted to the hospital under Dr. Maher's care where she remained until her release on September 13, 1986.
During the time Mrs. Prestenbach was in the hospital, Dr. Maher conducted other medical tests which indicated the patient had a gastric ulcer and a rectal polyp. Dr. Maher stated that, because Mrs. Prestenbach was depressed, he found it advisable to call in a specialist in the field of psychiatry, Dr. Escalada, for a consultation. Dr. Maher also stated that the patient had moderate hypoxemia, which is low oxygen content in the arterial blood. Dr. Maher testified that either the inhalation of smoke or an extreme psychological trauma could aggravate an asthmatic condition.
Dr. Malcolm Andry, Jr., an internist and gastroenterologist, testified that he treated Mrs. Prestenbach in the emergency room of Doctor's Hospital in the early morning hours of September 3, 1986. Dr. Andry's records show that Mrs. Prestenbach reported to him that she developed respiratory problems with symptoms of asthma which started shortly after the explosion of the transformer. She *243 had already been to East Jefferson for treatment but was now having a relapse and needed additional care. Dr. Andry stated that his examination at that time revealed her lung sound as being very tight, markedly prolonged expiratory phase with wheezes heard in all areas, and a dry cough. Her eyes had periorbital, not particularly injected. They didn't look particularly red. Her face was puffy, and she complained of burning. Dr. Andry testified that his clinical reaction to her symptoms was that she had an allergic reaction affecting her eyes and her asthma. He administered Aerosolized treatment with a bronchial dilator and eye drops. Dr. Andry opined that the exposure to the fumes or smoke from the transformer fire caused the symptoms.
Dr. Louis Escalada, the psychiatrist who treated Mrs. Prestenbach shortly after the transformer fire, also testified for the plaintiff. He stated that Mrs. Prestenbach was referred to him by Dr. Maher of East Jefferson Hospital. He stated that his diagnosis after the first consultation was a symptomatic one. He felt Mrs. Prestenbach was having depressive symptoms. She was also agitated and tearful and seem to be reliving visually, and with some emotional trauma, some of the images of what had occurred recently. Dr. Escalada testified that his diagnosis was adjustment disorder with mixed emotional features. Dr. Escalada also stated that such a diagnosis is somewhat misleading since adjustment disorder normally implies there is no preexisting pathology and in Mrs. Prestenbach's case there is a history of previous depression. However, Dr. Escalada stated that there certainly were elements of a recent trauma that precipitated some of the stress she experienced.
On cross-examination, Dr. Escalada testified that Mrs. Prestenbach felt some sort of abandonment concerning the loss of a sibling, and she transferred some of the guilt in that regard to the imagined mangled children in McDonald's. Dr. Escalada referred Mrs. Prestenbach back to her regular psychiatrist.
Dr. Mead Phelps, an emergency room physician at East Jefferson Hospital, testified that he treated Mrs. Prestenbach on September 2, 1986 at 3:41 in the afternoon. She reported that she was exposed to smoke from an explosion and was having trouble breathing. Dr. Phelps stated that his examination showed that Mrs. Prestenbach had a coarse wheezing in her lungs and his diagnosis was an asthmatic condition. Dr. Phelps treated her for asthma by giving her an Aerosol breathing treatment and other medications. After the first treatment she was much better, but still had some wheezing. So Dr. Phelps administered Aminophylline intravenously as well as an injection to stabilize the lung membranes. She was discharged shortly afterward. Dr. Phelps opined that the cause of the asthma attack could have been either the inhalation of the smoke or the stress of the incident.
Plaintiff also presented evidence from Dr. Marcos Fe-Borensten. Dr. Fe-Borensten is a psychiatrist who conducted a full psychiatric evaluation of Mrs. Prestenbach in February, 1991. At that time Mrs. Prestenbach was extremely depressed and suicidal. She related to the doctor a five year history of depression and referred to the transformer incident. She stated that she was still experiencing nightmares and flashbacks of the panic attack and the trauma she had sustained in 1986 when the transformer exploded.
Dr. Fe-Borensten admitted her to Tulane Hospital where she was treated for about three weeks. During that time Dr. Fe-Borensten conducted extensive psychiatric tests and concluded that Mrs. Prestenbach was suffering from severe depression superimposed upon an adjustment disorder as a result of the explosion. Dr. Fe-Borensten testified that he believed that Mrs. Prestenbach's depression was real and that she suffered a great deal as a result of the trauma of the explosion.
On cross-examination Dr. Fe-Borensten admitted that some of the depression was caused by organic changes in Mrs. Prestenbach's brain as a result of brain surgery to remove cancerous tumors.
Dr. David Mitchell, a psychiatrist who treated Mrs. Prestenbach on September 29, 1986 on the referral of Mrs. Prestenbach's attorney, testified that he took an extensive *244 history from Mrs. Prestenbach and discovered that she had a brother who was killed in a motorcycle accident. Just prior to the accident the brother had come to her house to play with her infant baby. She did not awaken the child. Following the death of her brother, who was seventeen at the time, she felt guilty and believed that if she had awakened the child the accident would not have occurred and her brother would still be alive. She never really worked though the feeling of guilt surrounding that trauma. Dr. Mitchell opined that Mrs. Prestenbach associated the noise of the explosion with the noise of the motorcycle and that would account for the belief that there were children in McDonald's. Her feelings of guilt for not attempting to save the children were related to the earlier incident of her brother's death.
Dr. Mitchell diagnosed Mrs. Prestenbach as having major depression and post traumatic stress disorder caused by the explosion. He admitted her to Southern Baptist Hospital on September 30, 1986 and she remained there until October 10, 1986. She was readmitted to Southern Baptist Hospital under Dr. Mitchell's care on January 26, 1989 after she gave a deposition in connection with this lawsuit and became "unglued". Dr. Mitchell explained that with this mental condition the traumatic event is persistently reexperienced. The patient may not think about the event daily, but, something in the newspaper about a similar event or, as in this case, a deposition could cause the patient to relive the entire event and experience the intense psychological distress. On this occasion Mrs. Prestenbach remained in the hospital until February 8, 1989.
Dr. Mitchell stated that Mrs. Prestenbach also feared that she would develop cancer as a result of exposure to the smoke. She did, in fact, develop cancer of the brain which metastasized to the lower end of the spinal cord. Dr. Mitchell continued to treat Mrs. Prestenbach up to the time of trial.
The plaintiff offered evidence from Ms. Yvette McKeough, Mrs. Prestenbach's daughter. She testified that she had a close relationship with her mother and that Mrs. Prestenbach was a gentle person. She further testified that Mrs. Prestenbach's emotional state before the accident was good. After the accident she was depressed and suffering respiratory problems. On cross-examination she admitted that her mother had suffered from depression at various times in her life before the incident in question.
Mr. Oscar Cade, who brought a similar suit against LP & L as a result of the transformer fire, testified that he was in his truck travelling down West Esplanade Avenue when the transformer caught fire. He was trapped by traffic for a short time and was unable to get away from the smoke and fumes which filled his truck. He stated that he was frightened and nervous. He had trouble breathing and was coughing. He said that the wind would cause the smoke to change directions. It would sometimes blow north toward Lake Pontchartrain and at other times it would blow east toward the New Orleans area.
After the traffic started moving again and Mr. Cade was able to move his truck, he drove to the Exxon station on the corner. While he was there the transformer exploded and black smoke rushed out covering the traffic lights at Severn Avenue. He stated that the explosion caused the telephone he was using at the time and the traffic lights on the corner to malfunction.
In a personal injury case the plaintiff bears the burden of proving a causal relationship between the accident and the injuries for which damages are claimed. American Motorist v. American Rent-All, 579 So.2d 429 (La.1991); Molaison v. Denny's Inc., 592 So.2d 916 (La.App. 5th Cir. 1991). However, a defendant takes his victim as he finds him and is responsible for all the natural and probable consequences of his tortious conduct. Id. A defendant must compensate the victim for the full extent of any aggravation to a pre-existing injury or condition. Id.
Here there is no evidence to link the plaintiff's cancer to the transformer explosion. There is, however, ample evidence to prove that this plaintiff had respiratory and emotional problems prior to the incident and that the explosion aggravated those *245 conditions. We cannot say that the jury was wrong in finding that the defendant is liable to the plaintiff for those damages.
We are mindful of the mandate in Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert. den. ___ U.S. ___, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994), which vests in the trier of fact great discretion and which allows this court to change an award of damages only when that "award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances." 623 So.2d at 1261. We believe this to be such a case.
In connection with the testimony of the various professionals in this case, the plaintiff introduced the following bills:

Dr. Mead Philps $ 113.33 and $75.00
Dr. Malcolm Andry $ 110.85
Dr. James Maher $ 315.00
Dr. Louis Escalada $ 130.00
Dr. David Mitchell $ 1,347.00
Tulane Medical Center $12,055.00
Dr. Marcos Fe-Borensten $ 2,329.00
 Total: $16,475.18

Although not conceding liability, the defendant stipulated to the authenticity of additional medical expenses totaling $14,643.15 and lost wages in the amount of $4,200.00.
The above mentioned $14,643.15 consists of the following:

 1. Charges related to the September 4 to 13,
1986 stay at East Jefferson Hospital.
 East Jefferson $6,048.45
 Cardiology Consult $ 445.00
 Delta Radiology $ 172.00
 Pulmonary Diagnostic Association $ 23.00
 2. Southern Baptist Hospital
for the stay from September 30 to
October 9, 1986. $2,944.40
 3. Southern Baptist Hospital
for the stay from January 27, to February
8, 1989. $4,966.30
 4. Radiology Medical Association $ 44.00

The award of special damages of $600.00 bears no correlation to the actual damages incurred by the plaintiff. Even if only the medical expenses for physical injuries were considered, the amount of actual damages equal more than the amount awarded. Further, we believe the plaintiff is entitled to an award of damages for medical expenses related to her psychological injuries. Where, as in this case, a plaintiff has an underlying psychological disorder which is aggravated due to the additional stress of an accident, compensation is afforded under the law. Miley v. Landry, 582 So.2d 833 (La. 1991).
As previously discussed, the patient was hospitalized in East Jefferson Hospital from September 4 to 13, 1986 by Dr. Maher. Dr. Maher testified that part of his diagnosis was related to the patient's respiratory problems which were aggravated by the smoke inhalation. However, tests conducted at the hospital show that she was also diagnosed and treated for a rectal polyp and a gastric ulcer. While the evidence presented shows an aggravation of the patient's pre-existing conditions, it does not show a causal link to the development of those conditions. Clearly, although the diagnosis occurred shortly afterward, Mrs. Prestenbach developed the ulcer and the polyp before the September 2, 1986 accident. Therefore, we do not find the defendant liable for the entire expense of the East Jefferson Hospital stay.
It is difficult to distinguish what portion of the period of hospitalization is attributable to the patient's other health problems. However, we find that, based on testimony of the previous two medical experts who treated Mrs. Prestenbach on September 2 and 3, 1986, only two of the ten days of the hospitalization are compensable. Consequently, we award $1,209.69 (20% of the $6,048.45) for the East Jefferson Hospital bill. We also award only 20% of Dr. Maher's bill, or $63.00.
We have also reviewed the additional bills incurred during that stay for diagnostic tests taken during that hospitalization and find that only one test conducted by Delta Radiology for a chest x-ray related to the respiratory problems of which Mrs. Prestenbach complained. The cost of that test was $19.00. The remaining bill from Cardiology Consult is compensable.
The bill from Radiology Medical Association for $44.00 listed above is dated February 14, 1989 and indicates it was a screen for cancer. Because the plaintiff has made no proof of a causal connection between *246 the accident and the plaintiff's diagnosis of cancer, we do not find this amount to be properly included in the damages.
For the foregoing reasons we award $25,851.27 for medical specials, itemized as follows:

Dr. Philps $ 113.33 and
 $ 75.00
Dr. Andry $ 110.85
Dr. Maher $ 63.00
Dr. Escalada $ 130.00
Dr. Mitchell $ 1,347.00
Tulane $12,055.00
Dr. Fe-Borensten $ 2,329.00
East Jefferson Hospital $ 1,209.69
Cardiology Consult $ 445.00
Delta Radiology $ 19.00
Pulmonary Diagnostic
Association $ 23.00
Southern Baptist Hospital $ 2,944.40 and
 $ 4,966.00

We further award $4,200.00 in lost wages for a total of special damages of $30,030.27.
We also find the award of $5,000.00 for general damages to be an abuse of discretion. A review of other cases for purposes of quantum is appropriate when an abuse of discretion is found. Hackman v. Southern Farm Bureau Ins. Co., 629 So.2d 531 (La.App. 5 Cir.1993). A review of such cases reveals that awards run the gamut from $15,000.00 to $300,000.00.[4] We find that the facts and circumstances of this case dictate a 25,000.00 minimum award for general damages, and we amend the judgment accordingly.
In all other respects the judgment of the trial court is affirmed.
AMENDED AND AS AMENDED, AFFIRMED.
GAUDIN, Judge, concurring.
I agree that damages should be increased, but not to the extent reflected in the foregoing opinion.
NOTES
[1] Prestenbach v. Louisiana Power & Light, 592 So.2d 499 (La.App. 5th Cir.1991).
[2] Prestenbach v. Louisiana Power & Light, 594 So.2d 882 (La.1992).
[3] Prestenbach v. Louisiana Power & Light, 92-C-825, September 11, 1992.
[4] See: Nicholas v. Voiron, 568 So.2d 1139 (La. App. 5th Cir.1990); American Motorist v. American Rent-All, 579 So.2d 429 (La.1991); Miley v. Landry, 582 So.2d 833 (La.1991); Molaison v. Denny's, 592 So.2d 916 (La.App. 5th Cir.1992).