653 So.2d 1231 (1995)
Edna Bianchini McNEELY
v.
NATIONAL TEA COMPANY d/b/a The Real Superstore, Ernest Jackson, Four Unidentified Security Guards, A, B, C, and D, and XYZ Insurance Company.
No. 94-CA-392.
Court of Appeal of Louisiana, Fifth Circuit.
March 28, 1995.
Rehearing Denied May 17, 1995.
*1232 Lila Molaison Samuel, Gretna, for plaintiff/appellant.
Arthur J. Lentini, Connick, Lentini, Mouledoux, Wimberly & DeLaup, Metairie, for defendants/appellees.
Before GRISBAUM, WICKER and GOTHARD, JJ.
GOTHARD, Judge.
Plaintiff, Edna Bianchini McNeely, filed this action against the National Tea Company, d/b/a The Real Superstore (Superstore), various individuals in its employ, and its insurer.[1] In her petition, Mrs. McNeely asserts that she received physical and emotional damages as a result of a false arrest by the defendants. After a two day bench trial, judgment was rendered in favor of defendants, dismissing plaintiff's case. Plaintiff appeals that judgment.
Plaintiff was Christmas shopping at the Superstore on December 22, 1991 with her two grandchildren, Shane, age four and Chase, age two, and her daughter, Mary Jane McNeely (Janie). The recitation of facts differs with the parties.
The plaintiff testified that she went to the Superstore to purchase toys for her grandchildren for Christmas. She stated that she spent some time on the toy aisle, which was in disarray with toys and batteries out of the packaging and off the shelves. She found a remote control car and a fire engine she was interested in purchasing, but both items were out of the original packaging and seemed broken. The fire engine was missing a wheel and the car was missing a bell. After some *1233 work, Mrs. McNeely reassembled two fire engines. However, she wanted to be sure they would operate properly, so she picked up some of the loose batteries on the floor and put them inside of the toys. Eventually she found two that worked, so she took the batteries out and put the trucks in her daughter's basket.
Mrs. McNeely further testified that she also bought food to prepare Christmas dinner for her family. Because she intended to pay with food stamps, she put the food items in her own basket and the gift items in her daughter, Janie's, basket. She testified that, in addition to the toys, Janie also purchased the batteries necessary to operate them.
According to the plaintiff's testimony, she went through the check-out line and paid for her groceries without interference. As she was about to get into her car, a security guard "grabbed" her arm. He and another guard physically turned her around and returned her to the store. As they did so, the men told Mrs. McNeely they had to speak to her immediately. The men pushed her basket, still carrying her four-year-old grandson and her groceries, behind the customer service counter. Her request to take her grandson was denied, and he was left unattended and crying in the child seat in the front of the basket.
The men then took Mrs. McNeely upstairs to a conference room. She stated that they "pushed" her upstairs, causing her to bump her knee on the way up. When they got into the conference room, one of the security guards showed her an empty battery package and asked where the batteries were. Mrs. McNeely repeatedly denied taking batteries out of the package and told them that any batteries she had were paid for and in Janie's possession. Mrs. McNeely testified that in the course of the investigation the guard tore open a small bag containing perfume she had purchased, and emptied the contents of her purse on the table, presumably looking for the missing batteries. None were found.
Mrs. McNeely stated that the guards attempted to get her signature on a form which contained a confession that she had stolen property from the Superstore. When she refused to sign the form, one of the guards stated, "you know, we can hold you here forever". Finally, when it became apparent that Mrs. McNeely would not sign the form, the security guard told Mrs. McNeely that she would have to pay for the batteries in order to leave. One of the store employees went downstairs to get a package of AA batteries. Mrs. McNeely paid for the batteries and was informed they were not returnable. She was then allowed to leave the Superstore. Mrs. McNeely testified that she felt ill during the incident and had to be taken to Meadowcrest Hospital immediately after she left the Superstore.
The plaintiff also offered the testimony of Janie McNeely who supported her mother's version of the events. She stated that she was buying perfume while her mother shopped for toys. She verified that she purchased the trucks and size D batteries.
She also testified that, as they left the store, a man grabbed her mother's arm. He was accompanied by another man and they pushed Mrs. Edna McNeely back into the store. One of the men was pushing Mrs. Edna McNeely's basket in which Shane still sat, and Ms. Janie McNeely followed behind pushing her basket in which Chase was sitting. Although she asked for an explanation, the two men did not respond.
When she got back into the store, Ms. Janie McNeely saw the basket pushed to the side behind the service desk. Because Shane was still sitting alone in the basket and had begun to cry, Ms. Janie McNeely asked if she could go into the locked area and retrieve him. Her request was denied at first, although she was later allowed to enter.
She was subsequently allowed up into the conference room where her mother was being held. When she arrived she saw the contents of her mother's purse scattered on the table. Her mother was crying. She asked what was wrong and her mother told her the guards thought she had stolen some batteries.
Ms. Janie McNeely verified that one of the Superstore employees involved in the investigation told her mother that if she did not sign the confession form they could keep her *1234 there forever. She stated that the guard who was trying to solicit the signature held the form and covered part of it with his hand, making it impossible for the two women to read it in its entirety.
The guards held an empty package of AA batteries. At one point they sent someone downstairs to get some batteries, and Mrs. Edna McNeely's freedom to leave was made contingent on the purchase of those batteries. The purchase was made and the group went downstairs. Under the circumstances, Ms. Janie McNeely decided that she wished to return everything they had just purchased. That was accomplished and the plaintiff and her party left the Superstore.
Deputy Donald Spell also testified for the plaintiff. Deputy Spell is a member of the Jefferson Parish Sheriff's Office who was working a detail at the Superstore on the day of the incident. He testified that he was approached by a security guard and advised that there was a problem with a "subject" being held upstairs. As he followed the guard to the security office, he saw a woman standing in front of the service desk. Behind the counter was a basket in which a small child was sitting, unattended. The woman asked Deputy Spell if she could get the child. Because he was unfamiliar with the situation, Deputy Spell told the woman to be patient, that he would find out what was going on and report back to her.
He proceeded upstairs to the security office where he observed several store employees and Mrs. McNeely seated in the room. He stated that Mrs. McNeely appeared to be very upset. She was very nervous and crying. He was told by store personnel that the investigation was about a theft of some batteries. According to the security guards, Mrs. McNeely opened a package of batteries, put them into a toy and then exited the store, paying only for the toy and not the batteries inside. He was also told they had found the empty package in the basket.
Because she appeared so upset, Deputy Spell asked Mrs. McNeely if she was on any medication. She responded that she took Nitroglycerin for her heart. Deputy Spell instructed one of the guards to get a glass of water so that Mrs. McNeely could take her medication and calm down.
Deputy Spell was in the room when Mrs. McNeely explained that she found batteries loose on the shelf and put them inside of the truck to see if it was operational. She also told them she took the batteries out and replaced them on the shelf. The guards did not allow Mrs. McNeely to leave after the explanation. They requested that she sign some forms. Although the deputy stated that he did not see the forms and could not be sure what they contained, he did hear Mrs. McNeely say that she would not sign them because they contained a confession and she had stolen nothing.
Deputy Spell further testified that he did not hear anyone tell her she could not leave until she paid for the batteries. However, he didn't hear anyone say she could leave. Deputy Spell testified that he was in the security office for about twenty minutes. Since there was no criminal activity, Deputy Spell left. He encountered the McNeelys later and walked the plaintiff outside to ensure that she did not need any medical attention.
The defense presented testimony from Melvin Johnson, who was the security supervisor for the Superstore on the day of the incident. He testified that he was dressed in plain clothes and walking throughout the store as part of his duties when he observed the plaintiff standing at a display of batteries located at the end of the toy aisle. Because she was standing there for an unusually long time, Mr. Johnson began to observe her activities from a camera in his office.
He saw her carry a pack of batteries from the display to the toy aisle. Mr. Johnson stated that Mrs. McNeely's purse was in the child seat and from the camera angle he could not be sure whether she put the batteries in the basket or in her purse. She picked up a toy, fumbled with it and then replaced it on the shelf. She walked a few steps and put the battery package on the shelf. He stated that he could not tell whether the package was empty or still contained the batteries. He froze the video tape so that he could be sure of the exact location at which Mrs. McNeely placed the pack, and sent an associate down to retrieve it. The associate returned *1235 with an empty package of AA batteries.
Mr. Johnson stated that he approached Mrs. McNeely at the check out stand before she unloaded her purchases, and asked to speak with her. He said that he asked her what happened to the batteries which were originally in the empty pack. She responded that she did not know what he was talking about and continued to check out her groceries. As they proceeded to the exit doors, Mrs. McNeely continued to deny any knowledge of the missing batteries and began to speak loudly. Mr. Johnson suggested they go upstairs and discuss the batteries and Mrs. McNeely agreed and accompanied him willingly. He denies touching Mrs. McNeely and stated that he did not see a child at any time in her basket.
When they got into the conference room, Mrs. McNeely explained that the batteries were in the fire truck that did not work, which she replaced on the shelf. Mr. Johnson went downstairs and found the batteries in the fire truck exactly where Mrs. McNeely told him they were. Mr. Johnson returned to the conference room and told Mrs. McNeely that he found the batteries and that he was not accusing her of theft. He stated, "She was not accused of stealing. I told her that because she said she didn't steal them. And, I made it clear to her, in front of everybody, that, you are not being accused of stealing."
Mr. Johnson asserted that Mrs. McNeely agreed to purchase the batteries voluntarily. However, he stated, "And I said, `Well, the package is damaged now,' and I said, We can't resell it'. So I said, `You'd have to purchase the pack now since you damaged it.'"
Mr. Johnson was questioned about the video tape taken of the incident. He stated that the video tape had been inadvertently destroyed. It is not clear from the record whether that tape was shown to Mrs. McNeely.
On cross-examination, Mr. Johnson admitted that he tried to get Mrs. McNeely to sign a company originated form which contained a release and a confession, but she refused. Mr. Johnson testified that the portion of the form containing the confession of guilt was crossed out. He also admitted that he never allowed the plaintiff to hold the form because he felt she would tear it up as she was in a very agitated state.
Rosa Gautreaux, an employee of the Superstore, also testified for the defense. She stated that she was called into the conference room where Mrs. McNeely was being detained because it is company policy to have a woman employee present when male security guards are questioning a female shoplifting suspect. Ms. Gautreaux testified that, when she entered the room it was occupied by two women and two young children. One of the women was talking loudly and grabbing her chest. She seemed to be having trouble breathing and was saying, "Oh my God, I've never stole anything in my life. I didn't steal anything".
Ms. Gautreaux testified that she did not hear anyone tell the plaintiff that she could not leave until she paid for the batteries. She further stated that no one searched or looked through the plaintiff's purse. She asserted that the plaintiff was fumbling through her own purse, taking some of the items out and placing them on the table. She stated that the incident ended when the plaintiff paid for the batteries.

LIABILITY
The trial court stated, in written reasons for judgment:
At the outset, the Court must say that the Superstore had reasonable cause to detain Mrs. McNeely to inquire about the open package of batteries. Based on the security officer's observations and his review of the video it is clear to the Court that he had a reasonable suspicion that Mrs. McNeely tampered with the package of batteries. Once that was established the Court was called upon to make the determination as to whether unreasonable force was used or whether the detention lasted more than sixty minutes unless it was reasonable under the circumstances that the suspect be detained longer. See Thomas v. Schwegmann Giant Supermarket, 561 So.2d 992, 995 (La.App. 4th Cir.1990). (Emphasis added)
*1236 To recover in an action for false imprisonment, a plaintiff must prove that either: (1) unreasonable force was used, or (2) no reasonable cause existed for the belief that the suspect had committed a theft of goods, or (3) the detention lasted more than 60 minutes, unless it was reasonable under the circumstances that the suspect be detained longer. Thomas v. Schwegmann Giant Supermarket, 561 So.2d 992 (La.App. 4 Cir.1990).
LSA-C.Cr.P. art. 215 permits a merchant, or a specifically authorized employee to:
"use reasonable force to detain for questioning on the merchant's premises, for a length of time, not to exceed sixty minutes, unless it is reasonable under the circumstances that the person be detained longer, when he has reasonable cause to believe that the person has committed a theft of goods held for sale by the merchant ..."
Under normal circumstances private citizens have no authority to detain individuals for petty theft, which is a misdemeanor under LSA-R.S. 14:67.10. Art. 215 gives quasi-police powers to merchants and their agents to protect against shoplifting, and gives them immunity from liability for malicious prosecution when the detainer has reasonable cause to believe that a theft of goods has occurred on their premises. Thomas v. Schwegmann Giant Supermarket, supra.
The trial court must decide whether reasonable cause existed to believe that the suspect committed a theft of goods. Thomas v. Schwegmann Giant Supermarket, supra. Reasonable cause is defined as something less than probable cause; it requires that the detaining officer have articulable knowledge of particular facts sufficiently reasonable to suspect the detained person of criminal activity. State v. Hudgins, 400 So.2d 889, 891 (La.1981); Thomas v. Schwegmann Giant Supermarket, supra at 995.
The trial court gave credence to the security guard's testimony and found, as a matter of fact, that the guard had reasonable cause to believe that Mrs. McNeely "tampered with the package of batteries." However, at the time of this incident, tampering with a package is insufficient to justify a detainment pursuant to article 215. There must be a finding that there is reasonable cause to believe that the suspect committed a theft of goods pursuant to LSA-R.S. 14:67.10 as it existed at the time of the incident.[2] The trial court in the instant case made no such finding, and thus committed an error of law.
In Thomas the plaintiff was detained on the suspicion that she had stolen a tube of glue from a package of Stick on Crazy Nails. The security guard testified that he observed the plaintiff open the box, try on the nails, and later deposit the nails and the partially empty box on different store shelves. The guard retrieved the nails and the box, but could not locate the tube of glue he thought the package contained. The plaintiff was detained and, as in the present case, became extremely upset.
The security guard admitted that he did not read the contents of the package before he detained the plaintiff. A cursory inspection revealed that the package of artificial nails did not originally contain a tube of glue, therefore, none was missing. The court ruled that under these circumstances the guard should have inspected the box in his possession before he detained the plaintiff.
*1237 Further, the court held that immunity under article 215 did not extend to merchants who detain shoppers for damage done to merchandise. The Thomas court, 561 So.2d at 997, stated:
La.C.Cr.P. art. 215 refers only to the theft of goods, a crime which has been specifically defined by the legislature in LSA.R.S. 14:67.10. Theft of goods requires an intent to deprive the merchant permanently of whatever may be the subject of the misappropriation, which intent may be inferred from five explicit types of misconduct. The criminal statute unequivocally does not include damage to merchandise.[3]
The case at bar can be factually distinguished in that there were clearly batteries contained in the package before it was opened. Thus, accepting the testimony of the defendant's employee, Melvin Johnson, that he saw Mrs. McNeely remove the batteries from the package and fumble with a toy and subsequently put the toy into her daughter's basket, reasonable cause can be found to support a belief that the plaintiff secreted the batteries into the toy. Consequently, we find that, although the reasons given by the trial court for her determination of reasonable cause are insufficient, given the testimony in this case, the defendant had reasonable cause to suspect criminal activity.
However, our inquiry does not end with that finding. The test of liability is not based on the store patron's actual guilt or innocence, but rather on the reasonableness of the store employee's action under all the circumstances. Brown v. Hartford Insurance Co., 370 So.2d 179 (La.App. 3 Cir.1979); Johnson v. Wal-Mart Stores, Inc., 574 So.2d 502 (La.App. 3 Cir.1991).
We find that the defendant acted unreasonably in detaining the plaintiff after Mr. Johnson ascertained that the batteries were not, in fact, missing. Once the batteries were located in the truck on the shelf, no reasonable cause existed for further questioning. Mrs. McNeely should have been released immediately, unconditionally. As previously stated, a merchant has no authority to detain a shopper if no criminal activity is suspected. It is clear from the testimony that Mrs. McNeely was subjected to further detainment and questioning after her innocence was established. Defendant's authority to detain a customer comes from the legislative grant provided for in article 215 of the Code of Criminal Procedure and, does not emanate from store policy of filling out forms and detaining customers while they pay for damaged goods.
During Melvin Johnson's testimony the following occurred:
Q. Okay. So you're in the room. And did she tell you, then, where, what she had done with the batteries?
A. Yes, once we got in the room she said where the batteries were.
Q. What did you do once she told you?
A. Well, the first thing I did was I went downactually, I said, "Exactly what toy was it?" because there was a couple of toys on the shelf. And she said it was the fire truck. She said the fire truck wouldn't work. She said it was broken, so she said she didn't want it. Because she had it in her buggy and she took it out and put it back on the shelf. So I went down and I checked the fire truck and the batteries were in the fire truck.
Q. They were in the fire truck?
A. Yes.
Q. Alright. After you discovered the batteries were in the fire truck, where did you go?
A. I came back upstairs in the conference room.
Q. What did you do?
A. Well, I told her that I found the batteries. And at that timeand I think the time before I told her she wasn't accused of stealing.
Q. She was not or was?
A. She was not accused of stealing. I told her that because she said she didn't steal them. And I made it clear to her, in front of everybody, that, *1238 "you are not being accused of stealing." So when I came back up with the batteries, I told her, I said, "Well, we have you on camera." And I explained that to her about the pack that she took out of her purse and placed on the shelf. And I said, "well, the package is damaged now," and I said, "We can't resell it." So I said, "You'd have to purchase the pack now since you damaged it." And she said she was going to pay for it, and I said okay.
It is also apparent from the testimony of Officer Spell that Mr. Johnson discussed the signing of forms and the purchase of the batteries even after it was discovered that no theft occurred. Officer Spell testified that he left because, "when I arrived I discovered that it was not a shoplifting complaint, as they were not pursuing criminal charges". Deputy Spell also testified that he was in the room for about 20 minutes while the Superstore personnel questioned Mrs. McNeely and attempted to get her to fill out forms.
Although we agree with the trial court that there is no reason to believe that the plaintiff was detained for over 60 minutes, we still find the detainment unreasonable under the circumstances and find the Superstore liable.

DAMAGES
Mrs. McNeely makes a claim for damages sustained to her knee and her heart as well as for emotional distress.
In support of her claim for damages Mrs. McNeely offered testimony from Dr. Gerard Romaguera, her family physician who has treated her since May of 1988. He testified that Mrs. McNeely has several health problems. She is a diabetic, has a possible cardiac problem and has a degenerative type arthritic condition in her knees. He further testified that Mrs. McNeely consulted him on December 30, 1991, complaining of pain in her chest, leg and hip. She told Dr. Romaguera that she was accused of stealing batteries and the security guard pushed her around. She also told the doctor that she went to Meadowcrest Hospital immediately after the incident complaining of chest pain. Dr. Romaguera further testified that he has treated Mrs. McNeely for depression since January of 1989, and has recommended she see a psychiatrist on several occasions.
On September 2, 1992, Mrs. McNeely returned to Dr. Romaguera's office complaining of knee pain. She related the injury back to the incident at the Superstore the previous year. Dr. Romaguera found no objective symptoms at that time. Between December 30, 1991 and September 2, 1992, Mrs. McNeely made no complaints about knee pain to Dr. Romaguera.
Also contained in the record is the deposition of Dr. Philip Ferris, who performed surgery on Mrs. McNeely's knee. He stated that he first saw the patient on October 19, 1992. Surgery to correct a tear in the meniscus of her right knee was performed on November 23, 1992. Dr. Ferris testified that the patient related to him that the problem began with the incident at the Superstore the previous year. Dr. Ferris stated that the tear was consistent with trauma, although he could not state exactly what caused the tear or when it occurred. With a tear such as this swelling of the knee may occur immediately or it may take some time. However, Dr. Ferris stated that it was not probable that the patient would not complain of pain in the eight months between the injury and the surgery.
The record also contains a report from Meadowcrest Hospital dated September 22, 1991 which shows that the plaintiff twisted her knee on that date, three months before the incident at the Superstore.
Although the trial court found no liability, and thus awarded no damages, the court did make certain factual findings as to the extent of the plaintiff's injuries. We find that the trial court was not manifestly erroneous in its finding that the plaintiff did not sustain any injury to her knee at the Superstore. In the written reasons for judgment the trial court stated:
While the Court believes that Mrs. McNeely may have been treated discourteously, based on the demeanor of the witnesses and as the Court perceived their credibility the Court does not believe that unreasonable force was used. The Court does not believe that Mrs. McNeely was *1239 pushed up the stairs. Based on Mrs. McNeely's demeanor at trial, the Court believes that it is highly likely that Mrs. McNeely became excitable and overreacted to the situation. Mrs. McNeely's daughter testified that she did not see her mother pushed up the stairs but that it looked like she was being supported up the stairs.
Also the Court does not believe that the testimony of Dr. Romaguera or the deposition testimony of Dr. Farris support a knee injury occurring on that date. The incident in question occurred in December of 1991 and Mrs. McNeely did not see Dr. Farris until October of 1992. Dr. Farris testified that it is possible that a meniscus tear may not cause pain for several months but that it's not probable.
We find ample support in the record for that factual finding, and do not award any damages for injuries to the plaintiff's knee.
The plaintiff also introduced into evidence the record of plaintiff's visit to Meadowcrest Hospital on the day of the incident. The record indicates that Mrs. McNeely complained of chest pains and was admitted to the hospital. Serial CPK isoenzyme tests and EKGs were administered and appeared to rule out acute myocardial infarction. The treating physician recommended that Mrs. McNeely undergo cardiac catheterization, but she refused this treatment and signed out against medical advice on December 23, 1991. She was advised to follow up at the cardiology center as an outpatient. She did seek treatment from Dr. Charles Steiner, a cardiologist. Dr. Steiner did not testify at trial, but the record contains three letters written by Dr. Steiner concerning Mrs. McNeely dated September 25, 1992, October 29, 1992 and March 8, 1993. In the final letter Dr. Steiner wrote:
"In summary, Mrs. McNeely does not appear to have a serious cardiac problem at the present time, based upon her recent workup in the office. In addition, it is my opinion that having been detained at the Real Superstore would not cause or contribute to worsening her present condition."
The record supports the finding that, although Mrs. McNeely did not suffer any damage to her heart as a result of the incident, she did become extremely upset and required medical treatment. The trial court found that Mrs. McNeely suffered an anginal episode on the day of the incident. We find no manifest error in that finding of fact, and award medicals incurred for the visit to Meadowcrest immediately following the incident.
Dr. Ellen MacKenzie, an expert in the field of psychiatry, testified that she began treating Mrs. McNeely on August 11, 1993. She testified that the Superstore incident was still very vivid to Mrs. McNeely and she continued to be very depressed and anxious about it. Dr. MacKenzie stated that she referred the patient to another doctor for a psychological examination. Dr. MacKenzie opined that Mrs. McNeely suffered from post traumatic stress disorder.
Dr. MacKenzie explained that Mrs. McNeely has had emotional problems since childhood. She has had two abusive marriages, the second to an abusive, domineering alcoholic. She has been involved in two automobile accidents since 1987. She is raising two young grandchildren and has been on anti-depressants since 1989.
She also stated that, given Mrs. McNeely's personality, the false arrest was a threat to her physical integrity, and to her view of herself as a law-abiding person. She further testified that Mrs. McNeely was very anxious going to any supermarket and still cannot go back to the Superstore. There was also testimony from one of Mrs. McNeely's grandchildren and a daughter concerning the adverse changes in Mrs. McNeely's personality.
The written reasons for judgment state:
With respect to the issue of post traumatic stress disorder, the Court does not believe that the plaintiff has proved by a preponderance of the evidence, that Mrs. McNeely sustained the disorder as a result of the Superstore incident. Dr. Romaguera testified that Mrs. McNeely has suffered from depression for a long while, that he has prescribed anti-depressants for her and that he has encouraged her to see a psychiatrist in the past. Mrs. McNeely was *1240 married to an abusive, alcoholic husband for 21 years. Mrs. McNeely was the victim of two accidents involving drunk drivers. Mrs. McNeely has for some time been raising her grandchildren. Based on her history and the testimony of Dr. Romaguera the Court believes Mrs. McNeely had a pre-existing nervous condition and suffered from low self-esteem. The Court believes that the anxiety that Mrs. McNeely experienced as a result of the circumstances was largely a result of her perception that she was being accused of shoplifting. The testimony of the Superstore personnel was clear that she was never accused of stealing nor were any charges ever filed.
It is apparent from the record that Mrs. McNeely had various emotional problems before the incident and it is further apparent from her testimony that she is a very excitable individual. Given the testimony, we find no manifest error in the trial court's finding that Mrs. McNeely did not suffer post traumatic stress disorder as a result of the incident at the Superstore. Nevertheless, it is also obvious that Mrs. McNeely suffered compensable damages as a result of the incident. Where, as in the present case, a plaintiff has an underlying psychological disorder which is aggravated due to the additional stress of an incident for which defendant is liable, compensation is afforded under the law. Prestenbach v. Louisiana Power & Light, 638 So.2d 234 (La.App. 5 Cir.1994).
For the foregoing reasons, we award general damages in the amount of $10,000.00. We further award $719.00 for Dr. Ellen Mac-Kenzie's bill as proven at trial.
At trial the parties stipulated to the total amount of medicals. However, because the amount is presented in a lump sum, we are unable to ascertain the correct amount of special damages to be awarded for the Meadowcrest visit immediately following the incident and we remand the matter to the trial court for that determination.
For the forgoing reasons the judgment of the trial court is reversed and there is judgment entered in favor of the plaintiff and against the defendant. The plaintiff is hereby awarded $10,000.00 in general damages, $719.00 in special damages, and the matter is remanded to the trial court for a determination of further appropriate special damages in accordance with this opinion. All costs of this appeal are assessed to the appellee.
REVERSED AND REMANDED.
GRISBAUM, J., concurs in part and dissents in part.
GRISBAUM, Judge, concurring and dissenting in part.
While I agree with the majority's conclusion that the detainment was unreasonable and the awarding of medical damages for the visit to Meadowcrest Hospital immediately following the incident, I cannot agree with the awarding of general damages. While we all agree plaintiff did not suffer post-traumatic stress disorder as a result of the incident at the Superstore, I disagree with the majority's statement that "[n]evertheless, it is also obvious that Mrs. McNeely suffered compensable damages as a result of the incident." The majority fails to show what damages plaintiff suffered.
We all agree there was no injury to plaintiff's knee that could be attributable to the incident. As for plaintiff's visit to Meadowcrest Hospital, we awarded the medical expenses on the factual finding of the trial court that plaintiff suffered an anginal episode the day of the detainment. The majority opinion points out plaintiff did not suffer any damage to her heart as a result of the incident. Finally, we find plaintiff did not suffer post-traumatic stress disorder as a result of the incident.
I agree with the statement of law that where "a plaintiff has an underlying psychological disorder which is aggravated due to the additional stress of an incident for which defendant is liable, compensation is afforded under the law." However, the plaintiff must prove a causal relationship between the injury and the incident. Hence, plaintiff must show her alleged pre-existing emotional condition was aggravated by the incident. The incident occurred in December 1991. Dr. MacKenzie, who opined plaintiff suffered from post-traumatic stress disorder, did not *1241 begin treating plaintiff until August 1993. The majority has failed to convince me there is a causal link between the Superstore incident and any injury plaintiff may have or any aggravation of a condition plaintiff may have suffered.
Therefore, I must dissent from the majority's opinion in the awarding of general damages.
NOTES
[1] The plaintiff used a fictitious name to identify the insurer in the original petition, and it is not clear from the record on appeal whether the true party was substituted.
[2] LSA-R.S. 14:67.10

A. Theft of goods is the misappropriation or taking of anything of value which is held for sale by a merchant, either without the consent of the merchant to the misappropriation or taking, or by means of fraudulent conduct, practices, or representation. An intent to deprive the merchant permanently of whatever may be the subject of the misappropriation or taking is essential and may be inferred when a person:
(1) Intentionally conceals, on his person or otherwise, goods held for sale.
(2) Alters or transfers any price marking reflecting the actual retail price of the goods.
(3) Transfers goods from one container or package to another or places goods in any container, package, or wrapping in a manner to avoid detection.
(4) Willfully causes the cash register or other sales recording device to reflect less than the actual retail price of the goods.
(5) Removes any price marking with the intent to deceive the merchant as to the actual retail price of the goods.
[3] We note that LSA-R.S. 14:67.10 has been subsequently amended to add the following: (6) Damages or consumes goods or property so as to render it unmerchantable.